[Crim. No. 8432. Second Dist., Div. Two. Sept. 26, 1962.]

THE PEOPLE, Plaintiff and Respondent, v. SAMUEL DODD WILLIAMSON, Defendant and Appellant.

Brock & Fleishman and Robert L. Brock for Defendant and Appellant.

William B. McKesson, District Attorney, Harold M. Stanley, Harry Wood and Ralph F. Bagley, Deputy District Attorneys, for Plaintiff and Respondent.

FOX, P. J.—Defendant was convicted of violating section 311, subdivision 3 of the Penal Code (selling an obscene book). The case comes to this court on the certification of the Appellate Department of the Los Angeles County Superior Court.

The alleged offense was committed on May 12, 1961. Section 311 provides that "Every person who wilfully and lewdly . . . 3. . . . sells, distributes, keeps for sale, or exhibits any obscene or indecent writing, paper, or book; . . . 6. . . . is guilty of a misdemeanor." Following a jury trial in the Municipal Court for the Los Cerritos Judicial District, defendant was convicted. The appellate department reversed the judgment of conviction on the theory that the court had erroneously and prejudicially instructed the jury with respect to the definition of obscenity.

The defendant contends that "as a matter of law and fact, the book, *Fear of Incest,* is constitutionally protected expression"; that it is protected by the freedoms of speech and

press. This thesis is based upon the premise that the book is not obscene under a proper definition of that term for it has been held that "[o]bscenity is not protected by the Constitution." (*Aday* v. *Superior Court*, 55 Cal.2d 789, 799 [13 Cal. Rptr. 415, 362 P.2d 47]; *Roth* v. *United States* and *Alberts* v. *State of California*, 354 U.S. 476, 481, 486 [77 S.Ct. 1304, 1 L.Ed.2d 1498].) In the latter cases the court stated: "We hold that obscenity is not within the area of constitutionally protected speech or press." (P. 485.) In *Aday*, our Supreme Court pointed out (p. 798) that "Recently the United States Supreme Court defined obscene material as that which deals with sex in a manner appealing to prurient interest; . . . and adopted . . . the test 'whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interests.' " (*Roth* and *Alberts, supra.*) On this point *In re Harris*, 56 Cal. 2d 879 [16 Cal.Rptr. 889, 366 P.2d 305], states (p. 880): "The standard for judging obscenity adequate to withstand the charge of constitutional infirmity is whether to the average person, applying contemporary community standards, the dominant theme of the material, taken as a whole, appeals to prurient interest. [Citations.]"

In *People* v. *Wepplo*, 78 Cal.App.2d Supp. 959 [178 P.2d 853], the court stated (p. 961): "A book is obscene 'if it has a substantial tendency to deprave or corrupt its readers by inciting lascivious thoughts or arousing lustful desire.' [Citations.]" This definition was approved in the *Roth-Alberts* case, *supra*. ▮ As pointed out in *Wepplo*, then the question whether a particular book is obscene is primarily one of fact. Absent an erroneous and prejudicially misleading definition of obscenity, we cannot upset the jury's determination that this book was obscene unless we can say, upon consideration of the book in its entirety, the jury could not reasonably reach such a conclusion. (*People* v. *Wepplo, supra.*)

▮ It thus becomes important to examine the instructions on this point. The court, on its own motion, gave the following instruction:

"The legislature of our state has defined the word 'obscene' as it applys [*sic*] to this case in the following language;

"Obscene means that to the average person, applying contemporary standards, the predominant appeal of the book taken as a whole, is to prurient interest, that is a shameful or morbid interest in nudity or sex which goes substantially beyond customary limits of candor in description or represen-

tation of such matters and is a book which is utterly without redeeming social importance."[1]

The court declined to give defendant's proposed instruction to the effect that if the jury did not find, beyond a reasonable doubt, that the predominant theme of the book, taken as a whole, has "a substantial tendency to deprave or corrupt the average person by arousing lascivious thoughts or lustful desires" they should find him not guilty.

The court also declined to give another instruction proposed by defendant to the effect that if the jury did not find beyond a reasonable doubt that the book, "applying contemporary community standards, appeals to the prurient interest of the average person" they should find the defendant not guilty.

In advising the jury that the Legislature had defined obscenity as stated in the quoted instruction, the trial court inadvertently erred in that the legislative definition of obscenity was incorporated into an amendment of section 311, Penal Code, at the 1961 session of the Legislature which, however, did not become effective until the following September 15, which was some four months after the commission of the alleged offense. Defendant argues that to give this instruction was not only error but prejudicial. He contends that the court should have instructed in accordance with the definition of obscenity in *People* v. *Wepplo, supra,* and approved in the *Roth-Alberts* cases.

It is suggested that the court's erroneous statement that the word "obscene" had been defined by the Legislature would cause the jury to give undue weight to it. We do not find any merit in this idea. The important thing is that the jury was told that the definition represented the law of the state and was the yardstick that they should apply in determining whether *Fear of Incest* was or was not obscene.

While it would not have been improper to have given the definition of obscenity that is quoted above from *People* v. *Wepplo, supra,* 78 Cal.App.2d Supp. 959, 961, it does not appear to us that it was prejudicial to the defendant for the court to define "obscene" as it did, for the predominant idea in the two definitions is substantially the same, although couched in different language. The definition given by the court has the merit of being more comprehensive in that it provides that contemporary standards must be applied in

[1]This definition of "obscene" is in harmony with *Roth* and *Alberts,* and *Aday, supra.* These cases were decided prior to the sale of the book here in question.

844

determining whether a particular production was obscene. It is true that under the *Wepplo* definition a book is obscene " 'if it has a substantial tendency to deprave or corrupt its readers by inciting lascivious thoughts or arousing lustful desire.' " The instruction that was given says that a book is obscene if, applying contemporary standards, its predominant appeal to the average person is to prurient interest which is defined as "a shameful or morbid interest in nudity or sex which goes substantially beyond customary limits of candor in description or representation of such matters" and the book "is utterly without redeeming social importance." When this latter definition is analyzed, it leads to the reasonable conclusion that a book which is obscene under that definition would have a substantial tendency to deprave or corrupt its readers by inciting lascivious thoughts or arousing lustful desire. Thus, there is no substantial difference between the two definitions except that the one given by the court was more comprehensive, precise and realistic. On this point it is stated in note 20 to the *Roth* and *Alberts* cases, *supra* (p. 487) : "We perceive no significant difference between the meaning of obscenity developed in the case law and the definition of the A.L.I. [American Law Institute], Model Penal Code, § 207.10(2) (Tent [.] draft No. 6, 1957." The definition of obscenity that the trial court gave in the instant case is substantially the same as that developed by the American Law Institute. (See A.L.I. Model Penal Code, § 251.4(1) (Proposed Official Draft, 1962).)

Even if it should be conceded that the *Wepplo* definition of an obscene book (so far as it goes) is somewhat more favorable to the defendant than the definition given by the court, it does not necessarily follow that this was prejudicial error justifying a reversal. Article VI, section 4½ of the Constitution provides: "No judgment shall be set aside, or new trial granted, in any case, on the ground of misdirection of the jury, . . . unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice."

In *People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243], the Supreme Court examined this constitutional provision and came to the conclusion that "a 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error."

In order to apply this principle properly it is necessary for us to make some brief reference to the character of the writing "taken as a whole" here under consideration. One of the judges of the appellate department of the superior court in a concurring opinion provides a fair summary, characterizing the book as containing a "series of wanton, offensive sexual acts of erotic and perverted consummations, of variegated means of accomplishment, . . ." He describes it as not only "dismally unpleasant, uncouth and tawdry" which, however, is not sufficient to make it obscene under *Manual Enterprises, Inc.* v. *Day*, 370 U.S. 478 [82 S.Ct. 1432, 8 L.Ed. 2d 639, 648], but he further states "It is both patently offensive and full of prurient interest appeal. Its repetitive, vivid and minutely descriptive portrayals of the sex acts between those of opposite and the same sexes, left little to the imagination, and that little built up and culminated in a constant stream of prurient interest appeal. It could not and did not have any different purpose or effect, and in its sordid detail transcended the prevailing bounds of decency. . . ." We might add that the book described a series of sexual debaucheries which could have no effect other than a "substantial tendency to deprave or corrupt its readers by inciting lascivious thoughts or arousing lustful desire" and that the book "is utterly without redeeming social importance."

The effect of such "literature" is to dull the moral sensitivity of many, if not most, of the people who read it. It serves to erode our moral standards and tends to bring about the moral decay of our people. If the time ever comes when the average person, applying contemporary standards, does not look upon such a book as detrimental to the public welfare, it will be a signal that our society has deteriorated to a low level and that our civilization is in danger of collapsing as other civilizations have in the past which have overindulged their appetites and cast aside decent standards of behavior.

In view of the character of the book taken as a whole and the debasing effect it is likely to have upon its readers, it does not seem reasonably probable that a result more favorable to defendant would have been reached had the challenged instruction not been given and the requested instructions on the definition of obscenity had been given. It therefore cannot be said that the challenged instruction resulted in a miscarriage of justice. (*People* v. *Watson, supra,* 46 Cal.2d 818.)

There is no merit in defendant's complaint relative to the instructions on the question of lewd intent. It is neces-

sary that it be established that defendant knew the contents of the book but it is not necessary to show that he knew it was obscene. ▆ Here the evidence disclosed that defendant was informed that the book was "filthy." Thereafter, he stated he had read part of it and found it pretty bad. He then read the book. He ordered more copies and was selling them at the time he admitted that he had read the book. It having been established that defendant had read the book and therefore had knowledge of its character, the jury could infer from such knowledge a lewd intent on the part of defendant. The jury was correctly instructed on this question.

▆ In *Smith* v. *State of California,* 361 U.S. 147 [80 S.Ct. 215, 4 L.Ed.2d 205], Mr. Justice Frankfurter (in his concurring opinon at p. 165) stated "It bears repetition that the determination of obscenity is for juror or judge not on the basis of his personal upbringing or restricted reflection or particular experience of life, but on the basis of 'contemporary community standards.' " This principle has previously been recognized in the *Roth-Alberts* case, *supra,* 354 U.S. 476, and the *Aday* case, *supra,* 55 Cal.2d 789. ▆ The People sought to assist the jury in this area by producing two witnesses. One was Dr. Daniel Haeger Flystra who was pastor of the Bethel Reform Church in Bellflower, which is in the general locality where the book was sold. He also conducted weekly radio broadcasts. Through his church affairs and through his broadcasts, he is in contact with a great many people in the community and is thus aware of the community standards of decency. He had read *Fear of Incest.* In his opinion, the book falls far below the standard of the community and far below the generally accepted standards of most people.

The other witness was William E. Daley, who is a Project Manager at Western Gear Corporation, who lives in North Long Beach. He was on the Lakewood Youth Committee and conducted its first few meetings. At these meetings, they had speakers in an effort to accomplish something toward banning pornographic and immoral books from the news stands. There were around 100 people present at the first of these meetings. There were representatives from the parent-teacher groups, women's clubs and other local organizations. Mr. Daley was also a member of a Committee of Lakewood Citizens for Decent Literature. He said the books brought before this committee were very mild compared to this book. Mr. Daley was aware of the community standards of decency because he had been interested in and worked in that field, and because he had

lived in that general area all of his life. He also had read the book, *Fear of Incest*. In his opinion, the book falls below the community's standards. He said that the only excuse for the book is to present a sordid picture of sex, that it was just an excuse to write about sex in a very descriptive way. His acquaintance in this field was, generally, in the southeastern portion of Los Angeles County.

Defendant contends that Dr. Flystra and Mr. Daley were not competent to give testimony on community standards. On this point, Justice Harlan in *Smith* v. *State of California, supra,* 361 U.S. 147 (in his concurring and dissenting opinion at p. 172) pointed out that "While a State is not debarred from regarding the trier of fact as the embodiment of community standards, competent to judge a challenged work against those standards, it is not privileged to rebuff *all* efforts to enlighten or persuade the trier of fact.

"However, I would not hold that any particular kind of evidence must be admitted, specifically, that the Constitution requires that oral opinion testimony by experts be heard. There are other ways in which proof can be made, as this very case demonstrates. Appellant attempted to compare the contents of the work with that of other allegedly similar publications which were openly published, sold and purchased, and which received wide general acceptance. Where there is a variety of means, even though it may be considered that expert testimony is the most convenient and practicable method of proof, I think it is going too far to say that such a method is constitutionally compelled, and that a State may not conclude, for reasons responsive to its traditional doctrines of evidence law, that the issue of community standards may not be the subject of expert testimony. I know of no case where this court, on constitutional grounds, has required a State to sanction a particular mode of proof."

Professor Wigmore suggests that the criteria for receiving opinion evidence is: "Can a jury from this person receive appreciable help?" (7 Wigmore on Evidence, § 1923.) It would seem that the broad contacts of Dr. Flystra and the active interest of Mr. Daley in this particular field and his explorations with respect to community standards in that area were such that the jury could receive appreciable help from them on the question at issue. In this connection, it should be observed that the discretion of the trial judge in receiving such evidence is very broad. Also, it is apparent that the question of community standards with

respect to asserted obscene writings is somewhat nebulous in character. Therefore, the opinion of a person who has had occasion to explore this question with the people in the area ought to be of some assistance to the jury. Any question as to the extent or reliability of their knowledge in this field goes to the weight of their testimony rather than to its admissibility. (*People* v. *Penny,* 44 Cal.2d 861, 866 [285 P.2d 926] ; *People* v. *Symons,* 201 Cal.App.2d 825, 831 [20 Cal.Rptr. 400].) We therefore conclude that the trial court did not abuse its discretion in permitting these two witnesses to testify with respect to community standards in this case.

The judgment of conviction is affirmed.

Ashburn, J., and Herndon, J., concurred.

A petition for a rehearing was denied October 24, 1962, and appellant's petition for a hearing by the Supreme Court was denied November 21, 1962.