Commonwealth *v.* Robin, Appellant.
Commonwealth *v.* Grove Press, Inc.,
Appellant.

Argued January 14, 1966. Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

John Rogers Carroll and Howard Gittis, with them Alan H. Molod, and Wolf, Block, Schorr and Solis-Cohen, for appellants.

David L. Creskoff, Assistant District Attorney, with him Joseph M. Smith, Assistant District Attorney, and Arlen Specter, District Attorney, for Commonwealth, appellee.

Julian E. Goldberg, with him Gilbert M. Cantor, for amicus curiae.

OPINION BY MR. JUSTICE COHEN, March 22, 1966:

The Supreme Court of the United States held in *Grove Press, Inc. v. Gerstein,* 378 U.S. 577, 12 L. Ed. 2d 1035, 84 S. Ct. 1909 (1964), that it is an unconstitutional abridgement of the First and Fourteenth Amendments of the Constitution of the United States for the State of Florida to enjoin, pursuant to its obscenity statute, the circulation of the book "Tropic of Cancer". In *State v. Huntington,* 204 A. 2d 411 (Conn. 1964) ; *Larkin v. G. P. Putnam's Sons,* 14 N.Y. 2d 399, 200 N.E. 2d 760 (1964) ; *State v. Locks,* 97 Ariz. 148, 397 P. 2d 949 (1964) ; *City of Chicago v. Kimmel,* 31 Ill. 2d 202, 201 N.E. 2d 386 (1964), the courts of those jurisdictions had occasion, subsequent to the *Gerstein*

case, to comment on the book "Tropic of Cancer" and in each instance held *Gerstein* was controlling and the circulation of the book could not be enjoined.

This Court held in *Commonwealth v. Blumenstein,* 396 Pa. 417, 153 A. 2d 227 (1959), that in determining the constitutionality of state obscenity statutes, the decisions of the federal courts are conclusive. Hence, even if we were to conclude that "Tropic of Cancer" is obscene we still would be required to reverse the lower court's holding since the Supreme Court of the United States has determined that the material involved is constitutionally protected and the circulation of the book may not be enjoined.

Decree reversed.

CONCURRING OPINION BY MR. CHIEF JUSTICE BELL:

I consider "Tropic of Cancer" a lewd, obscene book, which should be banned. However, I reluctantly concur in the result reached by a majority of this Court. My decision is mandated by the United States Supreme Court decisions in *Jacobellis v. Ohio,* 378 U.S. 184, 84 S. Ct. 1676, and *Grove Press, Inc. v. Gerstein,* 378 U.S. 577, 84 S. Ct. 1909.

Mr. Justice JONES and Mr. Justice O'BRIEN join in this Concurring Opinion.

CONCURRING OPINION BY MR. JUSTICE ROBERTS:

The decision of the Supreme Court of the United States in *Grove Press v. Gerstein,* 378 U.S. 577, 84 S. Ct. 1909 (1964) (per curiam), has made clear that the sale or distribution of the "Tropic of Cancer" may not be absolutely proscribed. We are bound by that decision.

. However, I do not view the decision in *Grove Press v. Gerstein* or the decision of this Court today to preclude governmental action designed to shield our juvenile population from the potentially adverse effect of

premature exposure to the "Tropic of Cancer" or like material.

Carefully drawn restrictions on the sale or distribution of such material to juveniles would in no way embody a novel approach. Courts have traditionally sanctioned policies which seek to accord special protection and treatment to our youth in such areas as the sale of intoxicating beverages, cigarettes and firearms; the operation and ownership of motor vehicles; the trial of juvenile offenders; and in many matters relating to their health, welfare, education and employment.

I share the concern of those who seek to protect our juvenile population and am of the view that such a policy in this area would have socially beneficial results. Neither the decisions of the Supreme Court of the United States nor the decisions of this Court prohibit governmental action which, while not inhibiting the right of adults to exercise their First Amendment privilege, insulates juveniles from material such as the "Tropic of Cancer", which they may lack the emotional maturity and judgment to place in proper perspective.

Mr. Justice JONES and Mr. Justice O'BRIEN join in this concurring opinion.

———

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

The decision of the Majority of the Court in this case has dealt a staggering blow to the forces of morality, decency and human dignity in the Commonwealth of Pennsylvania. If, by this decision, a thousand rattlesnakes had been let loose, they could not do as much damage to the well-being of the people of this state as the unleashing of all the scorpions and vermin of immorality swarming out of that volume of degeneracy called the "Tropic of Cancer." Policemen, hunters, constables and foresters could easily and

quickly kill a thousand rattlesnakes but the lice, lizards, maggots and gangrenous roaches scurrying out from beneath the covers of the "Tropic of Cancer" will enter into the playground, the study desks, the cloistered confines of children and immature minds to eat away moral resistance and wreak damage and harm which may blight countless lives for years and decades to come.

From time immemorial civilization has condemned obscenity because the wise men of the ages have seen its eroding effects on the moral fiber of a people; history is replete with the decadence and final collapse of mighty nations because of their descent into licentiousness and sloth.

Justice Fox of the District Court of Appeal of California in the case of *California v. Williamson,* 207 Cal. App. 2d 839, in discussing obscene and pornographic literature, said: "The effect of such 'literature' is to dull the moral sensitivity of many, if not most, of the people who read it. It serves to erode our moral standards and tends to bring about the moral decay of our people. If the time ever comes when the average person, applying contemporary standards, does not look upon such a book as detrimental to the public welfare, it will be a signal that our society has deteriorated to a low level and that our civilization is in danger of collapsing as other civilizations have in the past which have overindulged their appetites and cast aside decent standards of behavior."

United States Supreme Court Justice HARLAN said in the case of *Roth v. United States,* 354 U.S. 476: "The State can reasonably draw the inference that over a long period of time the indiscriminate dissemination of materials, the essential character of which is to degrade sex, will have an eroding effect on moral standards."

In the case at bar the Commonwealth brought an action in equity to restrain the defendants from selling and offering for sale the book, "Tropic of Cancer," under the Act of June 1, 1956, P. L. (1955) 1997, as amended, 18 P.S. §3832.1. After a long and exhaustive hearing, the court below found "Tropic of Cancer" obscene and issued the prayed-for injunction. The defendants appealed. This Court has reversed.

In the court below the defendants contended that the book "Tropic of Cancer" (hereinafter referred to for convenience in expression as "Cancer") was not obscene, that if obscene it was a work of social importance protected under the First Amendment to the Constitution of the United States, and that there was no proof that there was any association between obscenity and deleterious effects to society as a result thereof.

What is obscenity? Rivers of ink have flowed in an attempted definition of this word, and, more often than not, the greater the attempt at specificity, the more ambiguous has been the resulting language. The fact of the matter is that there is nothing complicated or puzzling about the word *obscenity*. It is a word as simple as *cat*. No person with reasonable intelligence and a modicum of human decency and dignity has any trouble in determining what is obscene. The determination does not require any long study in the laboratory, no working out of a mathematical formula. One sees at a glance whether a given exhibit or situation is obscene or not. In the case of *Roth v. United States,* the Supreme Court said: "Many decisions have recognized that these terms of obscenity statutes are not precise. This Court, however, has consistently held that lack of precision is not itself offensive to the requirements of due process. '. . . [T]he Constitution does not require impossible standards'; all that is required is that the language 'conveys sufficiently definite warning as to the proscribed conduct when measured by

common understanding and practices. . . .' . . . These words, applied according to the proper standard for judging obscenity, already discussed, give adequate warning of the conduct proscribed and mark *. . . boundaries sufficiently distinct for judges and juries fairly to administer the law.' "

The Court then defined obscenity as follows: "whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest . . . 'and if it goes substantially beyond customary limits of candor in description or representation of such matters.' " Is "Cancer" obscene?

Dr. Austin Joseph App teaches English and English Literature at LaSalle College. He obtained his Ph.D. at the Catholic University in English literature and philosophy, he is the author of some seven books. He was asked if, after reading "Cancer," it came within the definition of obscenity as laid down in the *Roth* case. He replied that it was his impression that Henry Miller, the author of the book, "wrote it precisely to fit that definition. It is obscene."

Mrs. Sigrid Craig is a graduate of the University of Pennsylvania, having majored in English and minored in psychology. She taught English in the Philadelphia High School for Girls, and for 24 years headed several of the citywide "committees interested in the welfare of my city." She was asked whether, under the obscenity definition of the United States Supreme Court, she thought that "Cancer," after having read it, was obscene. She replied: "There is no question about it the fact that the book is obscene, none whatever. . . There is no question, I think, that the entire recountal has to do with sex experiences that are unpleasant and filthy in the extreme. There is certainly no question that the love element, as we know it and like to think

of it, is completely devastated. The angle, as far as women are concerned, is entirely prostituted; there is as far as I could see, nothing but obscenity in his approach to life. I abhor the book."

The district attorney quoted Life magazine as classifying "Cancer" as "unbridled obscenity." The trial court found, as a fact, after the hearing, and after reading the book, that it was obscene.

The book "Tropic of Cancer" with its lewd companion "Tropic of Capricorn" was considered by the United States Court of Appeals for the Ninth Circuit, under an Act of Congress prohibiting the importation of obscene books, in the case of *Besig v. United States,* 208 F. 2d 142. The Court found the books obscene. It would appear that the "Tropic of Capricorn," although coming from the same author as "Tropic of Cancer" somehow was regarded by the district attorney in this case as "less objectionable." Thus what is said by the Circuit Court about obscenity applies in full force to "Cancer." Judge STEPHENS declared: "The vehicle of description is the unprintable word of the debased and morally bankrupt. Practically everything that the world loosely regards as sin is detailed in the vivid, lurid, salacious language of smut, prostitution, and dirt. And all of it is related without the slightest expressed idea of its abandon. . . The author conducts the reader through sex orgies and perversions of the sex organs, and always in the debased language of the bawdy house. Nothing has the grace of purity or goodness. These words of the language of smut, and the disgraceful scenes, are so heavily larded throughout the books that those portions which are deemed to be of literary merit do not lift the reader's mind clear of their sticky slime. . .

"The civilization of our times holds to the premise that dirt in stark nakedness is not generally and at all times acceptable. And the great mass of the people

still believe there is such a thing as decency. Indecency is easily recognizable. . .

. "The statute forbidding the importation of obscene books is not designed to fit the normal concept of morality of society's dregs, nor of the different concepts of morality throughout the world, nor for all time past and future, but is designed to fit the normal American concept in the age in which we live. It is no legitimate argument that because there are social groups composed of moral delinquents in this or in other countries, that their language shall be received as legal tender along with the speech of the great masses who trade ideas and information in the honest money of decency.

". . . If an incident, integrated with the theme or story of a book, is word-painted in such lurid and smutty or pornographic language that dirt appears as the primary purpose rather than the relation of a fact or adequate description of the incident, the book itself is obscene. . . .

". . . We share the general antipathy to censorship and we are aware that individual tastes and special occasions and different times and different peoples differ as to what is offensive language. Yet we risk the assertion that there is an underlying, perhaps universal, accord that there is a phase of respectable delicacy related to sex, and that those compositions which purposefully flaunt such delicacy in language generally regarded as indecent come under the ban of the statute."

But, the defendants here have argued that even if "Cancer" is obscene, it is protected from injunctive process because the book has social importance, quoting in their behalf, that part of the *Roth* decision where the Supreme Court said: "All ideas having the slightest redeeming social importance—unorthodox ideas, controversial ideas, even ideas hateful to the prevailing

climate of opinion—have the full protection of the guaranties, unless excludable because they encroach upon the limited area of more important interests."

Dr. App testified that "Cancer" "has no sociological or social importance."

Reverend Joseph T. Kirland is assistant minister at the Union Baptist Church, the largest Baptist Church in Philadelphia. He is a graduate of the Virginia Union University, Crozier Seminary and Divinity School of the Protestant Episcopal Church. He was asked "In your opinion, does the book, 'Tropic of Cancer,' have even the slightest redeeming social importance?" He replied: "None whatsoever." He also testified that in his opinion, applying standards laid down by the Supreme Court, the book was obscene.

To say that "Cancer" has no social importance is like saying that a gorilla at a lawn party picnic does not contribute to the happiness of the occasion. "Cancer" is a definite sociological evil. It is not to be described negatively. It is a positive menace to the well-being of the community in which it contaminates the air it displaces. It condemns, outrages, and ridicules the most fundamental rules of good society, namely, honesty, morality and obedience to law. It encourages anti-Semitism and racial conflict. It incites to disorder.

Dr. Nicholas George Frignito is the medical director and chief psychiatrist of the County Court of Philadelphia, which includes the Juvenile Court. He is a graduate of Hahnemann Medical College and has been certified as a specialist in neurology and psychiatry by the American Board of Neurology and Psychiatry through the American Medical Association. He is professor of neurology at Hahnemann, visiting chief psychiatrist at the Philadelphia General Hospital and consulting neuropsychiatrist to the Veterans Hospitals in Philadelphia and its facilities. He read "Cancer" and

was asked at the hearing in the court below to describe the book. He said: "The book is a biography of degenerate, chaotic sexuality. It is an extremely offensive book, and it revels in the perverse preoccupation with expository sexual functions. The story is actually a repetitious tale of indecent erotic episodes of nymphomania—it is called satyriasis in the male, and in the female it is called nymphomania."

Who is the author of this monstrous work, as described by the witnesses in Court? Henry Miller, who identifies himself in the book as a thief, an adulterer, and a "hopeless lecher." He is irreverent, profane and blasphemous. He lauds harlots and glorifies a sinful career. Dr. App testified: "This book is a libel on woman. Contrary to all great literature, Miller's book is one long libel on womanhood, a constant sneer at virgins and wives, and reduces them all to harlots or would-be ones. His only praise of woman is the passage glorifying and sympathizing with harlots."

He said further that the book "encourages harlotry and perversions."

Rev. Kirkland testified: "The book is vulgar. I have been in the Army, and I have associated with peoples in areas of all levels of life. I have never in all my life heard the type of language that is used in the book. Q. You have not? A. I have not, even in the lowest circles. I haven't been a minister all of my days."

Witnesses pointed out how Miller in "Cancer" refers to Jews as "kikes" and to colored persons as "niggers." However, one does not need to read the testimony of these witnesses as to what the book means in the communities in which it is sold. Henry Miller himself proclaims the degenerate character of his work in the introduction where he says: "This then? This is not a book. This is libel, slander, defamation of character. This is not a book in the ordinary sense

of the word. No, this is a prolonged insult, a gob of spit in the face of Art, a kick in the pants to God, Man, Destiny, Time, Love, Beauty . . . what you will. I am going to sing for you, a little off key, perhaps, but I will sing. I will sing while you croak, I will dance over your dirty corpse."

A *favorable* review of "Cancer" describes it in the following language: ". . . Lice, bedbugs, cockroaches, and tapeworms crawl across its pages; they are spattered with spittle, pus, vomit, scum, and excrement; blood, bile, semen, and sewers flow through them. Women, most of them prostitutes, throng 'Tropic of Cancer.' Miller and his pals lust after them daily, and perform feats of satyriasis; but in their thoughts and talk a woman is seldom a 'woman' "—she is a name for a portion of her anatomy.

The district attorney referred to Henry Miller, as a "filthy, dirty mind." In questioning a witness he said: "He [Miller] was banned from entering England because of this book being published in France in the English language."

The attorney for the Grove Press, publishers of "Cancer" spoke of Henry Miller as a "respected writer." The trial judge replied: "I can't believe a man is a respected writer who would say he would give a kick in the pants to God, who would call the Jews kikes, and the colored people niggers. I can't think under any guise of literary interpretation where a man of that kind can be called respected. He insults the very image of Christianity, he insults the Jewish race —and this is apart from the obscenity. Those are a few of the things that are apart from the obscenity. How can such a man be classified as respected in anybody's language, even in the language of the sophisticates or intellectuals, so-called?"

Even if "Cancer" did have the slightest social importance, which of course, it has not, it still could not

claim immunity under the First Amendment because the Supreme Court in the *Roth* case very emphatically laid down the rule that no social importance can give legality to what is obscene: *"But implicit in the history of the First Amendment is the rejection of obscenity as utterly without redeeming social importance.*[1] This rejection for that reason is mirrored in the universal judgment that obscenity should be restrained, reflected in the international agreement of over 50 nations, in the obscenity laws of all of the 48 States[2] and in the 20 obscenity laws enacted by the Congress from 1842 to 1956. . . . We hold that obscenity is not within the area of constitutionally protected speech or press."

This same fundamental constitutional irrefutable proposition was laid down in *Chaplinsky v. New Hampshire,* 315 U.S. 568, where the Court said: "There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of *which have never been thought to raise any Constitutional problem. These include the lewd and obscene.* . . It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality."

. . The defendants argued that under the *Roth* case only hard-core pornography comes within the ban of obscenity, and this would exclude "Cancer". The defendant would have reason to say that "Cancer" is not hard-core pornography; it is, in fact, *rotten*-core pornography. No decomposed apple falling apart because of its rotten core could be more nauseating as an edi-

---

[1] All italics mine.

[2] This decision was rendered before the Alaska and Hawaii territories became States.

ble than "Cancer" is sickening as food for the ordinary mind. "Cancer" is dirt for dirt's sake, or, more appropriately, as Justice FRANKFURTER put it, dirt for money's sake.

Then the defendants say that "Cancer" is entitled to immunity under the First Amendment because court decisions have declared that only worthless trash may be proscribed as obscene. To say that "Cancer" is worthless trash is to pay it a compliment. "Cancer" **is the sweepings of the Augean stables, the stagnant** bilge of the slimiest mudscow, the putrescent corruption of the most noisome dump pile, the dreggiest filth in the deepest morass of putrefaction.

Falling back from position to position, arguing merit where none exists and claiming immunity which no law upholds, the defendants maintain that even if "Cancer" can be regarded filthy, obscene and rotten, it nevertheless qualifies for legal guardianship if it possesses the slightest literary value. In effect, they say that if a fresh maple leaf should fall into a sewer, the sewage could then be run into a swimming pool to refresh and engladden the bathers disporting therein. The law is not so foolish.

**And then, standing at the very last ditch, the apolo-**gists for "Cancer" glibly assert that there is no proof anywhere that "Cancer" or any work of that character has any bearing on human conduct. Of course, scientific research, sociological study and juvenile and criminal court records, as well as the realities of life are all to the contrary. Dr. Frignito, speaking directly of "Cancer," testified in the court below: "The book is so obscene and lewd it is dangerous to all individuals of all ages, but more so to the young, particularly since they are at an immature age yet and understand very little of the dangers involved in sexual promiscuity, and, of course, in the practices related in this book. . .

"It has been my experience in the County Court of Philadelphia over the past 15 years that I have been an examiner, and for the past five years the chief psychiatrist, and also an examiner, that the increase in fornication and bastardy, disorderly street walking and prostitution, and other sexual offenses, have increased almost 50% during the past 10 years. Our experience in the court has been also that there has been an increase in illegitimate births, particularly in the adolescent girl under the age of 17. . .

"In many instances the increase in sexual offenses was traced to the persistent and constant exposure to obscenity in all media of communication—not only books, but pictures.

"Many of the boys and girls who come to the attention of the court and are declared delinquent on charges such as robbery, larceny or burglary, or truancy, or what have you, 75% also are sexually indiscreet and have practiced some type of sex activity. The frequency of sexual relations among the delinquents in the boys is as high as 80 to 90%. Adolescent boys of the delinquent group start sexual relations from the age of 10 or 12; most of them start at 13. 75% of these children will say that they had been stimulated not only by the talk of their companions, but also by the use of obscenity or smut. . .

"As I say, in my experience, and those of us who are employed in the court, psychiatrists and psychologists, pornography plays a major role in sexual delinquency. In some cases, because of the immaturity of the boy and the girl, it has led up to heinous crimes. We have recorded in our court instances of homicide, where an adolescent boy became so involved and frightened because of a sexual assault that he murdered his victim, or killed his victim. These records are on file at the County Court. . ."

Dr. Frignito was asked specifically if the "Cancer" fitted "into the stream of obscenity which you described heretofore in your testimony." He replied, "Yes, it does." He was asked: "Based upon the type of obscenity which you have described in your testimony, how many case histories are you personally familiar with where obscene material is a causative or triggering factor leading to acts of sexual aggression or other criminal act?"

He replied: "A. You mean all types of criminal acts? Q. All types of criminal acts. A. Well, in my experience in the court, more than 50%—our figure is higher, but to answer here, I would say more than 50% are attributable to obscenity."

To seriously contend that pornography in no way contributes to delinquency is to close one's eyes to the long experience of qualified persons in the field. Dr. Benjamin Karpman, Chief Psychotherapist at St. Elizabeth's Hospital, an institution for the mentally afflicted, in Washington, D. C., has declared that "there is a very direct relationship between juvenile delinquency, sex crimes and pornographic literature." J. Edgar Hoover, the chief law enforcement officer in the United States, has said: "I personally believe that pornography is a major cause of sex violence. I believe if we could eliminate the distribution of such items among impressionable school-age children we should greatly reduce our frightening sex crime rate." He said further: "The circulation of periodicals containing salacious materials play an important part in the development of crime among the youth of our country."

Ralph McGill, one of the great editors in America, has said: "The unemployed hoodlum gangs in the large cities are obviously oriented by all they have seen in movies, in comic and pornographic books."

Dr. E. Preston Sharp, Executive Director of the Youth Study Center of Philadelphia who served as

supervisor of rehabilitation at the Eastern State Penitentiary of Pennsylvania, in testifying before a Congressional committee, said: "There is no question that pictures and stories emphasizing sex exert a strong influence on many adults and youth. . ."

What is the explanation for the frightening increase in crime in America, especially sex crimes? It is not the result of inadequate educational facilities. Never before in the history of the world has there been such opportunity for schooling as there is in the United States. Why does the crime rate continue to augment?

A news report as late as March 8, 1966, stated: "FBI Director J. Edgar Hoover on Monday reported that crime increased by 5 per cent in the Nation in 1965, with wrongdoing growing twice as fast in the suburbs as in the big cities. . . Rape led the national crime-rate increase with a 7 per cent gain."

Rape represents the most depraved animalistic aberration in the whole catalogue of offenses against society. For a youth or grown-up man to cast away the last modicum of social restraint and bestially inflict injury and irreparable harm on an innocent girl or woman means that the attacker has been prodded into primitive violence by a force of extraordinary excitation long continued.

In a secluded spot near Nashville, Tenn., recently a man sexually attacked and then murdered, a 17-year old girl. Searching the suspect's home, the police found huge quantities of obscene literature and pictures—some depicting precisely the crimes he is alleged to have committed. Herbert W. Case, former Detroit police inspector, has made the statement: "There has not been a sex murder in the history of our department in which the killer was not an avid reader of lewd magazines."

As a result of an investigation of pornography by a U. S. Senate committee in 1956, the late Senator

Estes Kefauver, the committee's chairman, announced: "The impulses that spur young people to sex crimes are unquestionably intensified by reading obscene periodicals."

A resolution of the National Council of Juvenile Court Judges states: "The character of juvenile delinquency has changed as a consequence of the stimulation of salacious publications, being no longer the mischievous acts of children, but acts of violence, armed robbery, rape, torture and even homicide, for which the vicious publications condition the minds of our children."

A tide of printed filth is driving across the land at such height and volume as to cause wholesome-thinking people to wonder and worry whether it may not impair the very foundations of the basic morality upon which our nation and our Constitution were founded. In bookstores, railroad stations, air terminals, drug stores, everywhere that print is displayed and pictures revealed, there stand pyramids of smut, pornography and obscenity.

Language which would be too raw and grating for the dives of opium-smoking debauchees degrades and defaces the paper which carries it. Magazines with pictures and sketches that would disgrace oriental harems are sold to children as if they were innocuous bags of popcorn. Exotic rites that would raise the blush of shame to the faces of the most primitive tribes are described with nonchalance in high-priced books, medium-priced books, and low-priced books. Themes which should be the subject only for clinical studies in the hospitals for the criminal insane are turned into scarifying stories which inflict untold harm to the youths into whose hands they fall.

Acts of degeneracy and unnatural conduct are being portrayed in contemporary literature as if they were normal and accepted practice in civilized life.

Adultery and every other type of illegal and sinful conduct is being depicted glamorously, inviting emulation. The healthful, romantic, and poetic relationship between man and woman is being treated in the basest and grossest of terms.

It used to be that pornographic literature, to the extent that it existed, was trafficked in clandestinely. The secrecy and the furtiveness with which it was sold and circulated was an indication that the public looked upon it as something improper and not in consonance with the morals of the community. But now the most salacious books, the most degrading publications are sold openly practically everywhere. It is difficult to think of a mart where print appears that one's eyes and spirits will not be assailed by pornography of the vilest character. And it is impossible to believe that over a sufficient period of time, this situation can do other than deleteriously affect the moral standards of the nation.

So far as youth and immature minds are concerned, pornographic literature can do as much harm as narcotics. Of course, no one dares to defend illicit traffic in narcotics but a thousand tongues will wag to protect filthy books and magazines. Pornography is big business. It is conservatively estimated that the traffic in pornography in the United States amounts yearly to several billion dollars. Naturally the tycoons who can light cigars with hundred dollar bills as they ride in their luxurious yachts which cruise over rivers of printed filth will resist every effort to curb their de luxe and malodorous voyages.

And so, the false cry of censorship is heard in the land. But there is no censorship involved in banning pornography. The Supreme Court of the United States declared emphatically in the *Roth* case, as already stated, that "implicit in the history of the First Amend-

ment is the rejection of obscenity as utterly without redeeming social importance."

There can be no more false notion than the one that the First Amendment protects everything that may be uttered orally or in print. We have laws which prohibit false advertising of food and drugs. If law will protect the people from poison which may enter their systems through the throat, why may law not protect children from poison which may enter their minds, and do far more harm than any extra grain of aspirin. The constant fare of dirty books, to the exclusion of good literature, will eventually produce a sick mind. The mind governs the body and if the mind becomes sick, the body will become sick. The American Medical Association has reported that social disease is rampant and that Americans are being infected with it at a rate of almost two a minute. Most of those affected are young people, the AMA has said. The rise in VD has been described as the nation's most urgent communicable-disease problem. And among the causes of this horrible affliction are listed a "free and easy attitude toward moral standards." And where does this free and easy attitude toward moral standards get its greatest impetus? It would not be illogical to reply that much of it comes from the obscene literature of the day.

But still the notion persists that a book cannot be touched by the law, that somehow a book cannot be wrong. It will be admitted that there are books which inspire, instruct, and encourage but it is asserted there is no book which can do wrong. And so the defendants argued in the court below that "Cancer" was immune from Pennsylvania law on the ground that the First Amendment of the U.S. Constitution clothed it with invincibility. The contention that anything printed is protected by the Constitution is arrant nonsense. It is the most bizarre notion imaginable that a print-

ing press constitutionalizes every paper that passes between and beneath its rollers. Filth does not lose its stench or its bubonic characteristics because it is formed into letters of the alphabet. If everything that is printed or written is presumed to be good and incapable of evil, then correspondence on conspiracy to overthrow the government, ransom notes or even counterfeit money could not become the basis for prosecution of those who engage in its dissemination or use.

World War II which filled the universe with graves, cripples, devastation and ruin, began with a *book*! Hitler's *Mein Kampf* fired Germany with a bellicose spirit, a hatred for minority and helpless peoples, and whipped the nation into a global conflict which almost drove civilization to the very brink of destruction, where indeed it even teeters today.

The crimes that are committed in the names of books are legion. There was a day when books were read for instruction, explanation, entertainment and inspiration. One entered into a book as one enters a temple of wisdom, a sanctuary of guidance, a circus of fun or a cathedral of spiritual exaltation.

But is "Cancer" really a book? The Commonwealth answers that question by pointing out that "Cancer" "lacks the recognized format of a novel. There is no progress, no play of varied interests. Defense witnesses tried to attribute to it a content of protest, protest against the stuffy moralities of the times, protest at the stupidity of work. There is no such protest in the book. There is some comment, but even this is en passant and does not go beneath the surface or beyond the anecdotal stage. There is only one refrain throughout the material, and that is the four-letter word. It is argued that this is necessary to the true exposition of the scene. On the contrary the words are not needed to describe the scene—they *are* the scene."

The preface to "Cancer" characterizes its worthlessness when it tells the reader: "Let us try to look at it with the eyes of a Patagonian for whom *all that is sacred and taboo in our world is meaningless.*"

"Cancer" is not a book. It is a cesspool, an open sewer, a pit of putrefaction, a slimy gathering of all that is rotten in the debris of human depravity. And in the center of all this waste and stench, besmearing himself with its foulest defilement, splashes, leaps, cavorts and wallows a bifurcated specimen that responds to the name of Henry Miller. One wonders how the human species could have produced so lecherous, blasphemous, disgusting and amoral a human being as Henry Miller. One wonders why he is received in polite society.

I would prefer to have as a visitor in my home the most impecunious tramp that ever walked railroad ties, a tramp whose raggedy clothes are held together by faith and a safety pin, a tramp who, throughout his entire life, always moved at a lazy pace, running only to avoid work, a tramp who rides the rods of freight cars with the aplomb of a railroad president in his private train, a tramp who knows as much about Emily Post's etiquette as a chattering chimpanzee, and who couldn't care less; I would prefer to invite that lazy, bewhiskered cavalier of the road to my residence for a short visit, than even to see on the highway that hobo of the mind, that licentious nomad called Henry Miller, whose literary clothes are plastered with filth, whose language is dirtier than any broken sewer that pollutes and contaminates a whole community;—Henry Miller who shuns a bath of clean words, as the devil avoids holy water, who reduces human beings to animals, home standards to the pigsty, and dwells in a land of his own fit only for lice, bedbugs, cockroaches and tapeworms.

So far as American standards are concerned, I would regard Henry Miller as Moral Public Enemy No. 1, doing more damage to the ethic foundations of our Republic than any criminal, whose picture appears in the lobby of postoffices under the heading: "Wanted by the Police!" Those criminals have warred on society but Henry Miller's works, with those of his brother pornographic writers, unless curbed by the law, may eventually undermine the moral foundations of our nation because they are aimed at the youths of today who eventually will be the citizens of tomorrow.

"Cancer" is not a book. It is malignancy itself. It is a cancer on the literary body of America. I wonder that it can remain stationary on the bookshelf. One would expect it to generate self-locomotion just as one sees a moldy, maggoty rock move because of the creepy, crawling creatures underneath it.

Henry Miller is not the only foul-minded pornographic writer. There are others whose gangrenous productions raise a stench that would make polecats smell like new-mown hay in comparison. "Cancer" was published by the Grove Press whose printing presses must by now be corroded with the festering mildew emanating from the accounts of human depravity, abnormal relations and Satanic perversion which have passed over its purulent type. Recently it advertised "Cancer" as a "classic"! It said that "suppression and censorship of the erotic impulse have made healthy sexual attitudes so difficult." What the Grove Press calls "censorship of the erotic impulse" is the desire of the American people to be liberated from the bubonic plague of morbid unnatural emphasis on sex. Abnormal sex and immorality are being hammered into the minds of the youth of America with such shattering influences and incessant repetition that it is displacing from the thoughts of myriads of minors the concentration due other vital facets of life. Devotion

to country, ambition for wholesome careers, desire for approval in the eyes of the community are being violently shouldered aside for this artificially-stimulated craving until that craving may well persuade youth into illicit behavior and moral shipwreck.[3]

The court below, after a long hearing, as already stated, issued an injunction against the sale and offering for sale of "Cancer" within its jurisdiction. The court filed an Adjudication in support of its findings and its action. The defendants appealed and the Majority of this Court reversed. It reversed with an opinion that is a cryptogram which would seem to have been composed in an ivory tower of jurisprudential unapproachability. It nowhere comes to grips with the problem which vexes the people of the Commonwealth. The Majority Opinion offers no excerpts from the cases it alleges disposes of this vitally important litigation. It uses no quotation marks except around "Tropic of Cancer." It laconically states: "The Supreme Court **of the United States held in Grove Press, Inc. v. Gerstein, 378 U.S. 577, 12 L. Ed. 2d 1035, 84 S. Ct. 1909 (1964), that it is an unconstitutional abridgment of the First and Fourth Amendments of the Constitution of the United States for the State of Florida to enjoin, pursuant to its obscenity statute, the circulation of the book 'Tropic of Cancer.'** "

As a matter of rigid adherence to the United States Supreme Court reports, the Supreme Court did not say what the Majority Opinion says it says. In point of accuracy, the Supreme Court said nothing at all like

---

[3] *Newsweek*, after a country-wide survey, reported (March 21, 1966) in an article entitled "The Teen-Agers," "Two obstetric residents at the Emanuel Hospital in Portland, Ore., assert that pregnancy is the leading cause of the city's high-school dropouts. Across the U.S., illegitimate live births among mothers aged 15 to 19 were 40,000 in 1940, and climbed to more than 101,000 out of **4 million births in 1963.**"

this. It wrote no opinion and entered the simple order: "The petition for a writ of certiorari is granted and the judgment is reversed." Justices BLACK and DOUGLAS said they would reverse because of Justice BLACK'S opinion in the *Jacobellis v. Ohio* case (378 U.S. 184), Justices BRENNAN and GOLDBERG said they would reverse because of Justice BRENNAN'S opinion in the *Jacobellis* case, and Justice STEWART said he would reverse because of what he said in that same *Jacobellis* case. Not more than two Justices agreed on anything. And, more than that, the *Jacobellis* case, the supposed precedent for the *Gerstein* case, said absolutely nothing about "Cancer." Indeed it did not even discuss obscene books of any kind. The *Jacobellis* case had to do with *motion pictures*. And in that case not more than two Justices agreed on any one feature of it. Justices BRENNAN and GOLDBERG reaffirmed the definition of obscenity in the *Roth* case; Justice WHITE merely concurred in the judgment. Justices BLACK and DOUGLAS said that convicting anyone for exhibiting a motion picture abridges freedom of the press. Justice STEWART said that under the First and Fourteenth Amendments, "criminal laws in this area are constitutionally limited to hard-core pornography." Justice GOLDBERG said that the motion picture involved had a "familiar subject in old and new novels and in current television soap operas." Chief Justice WARREN and Justice CLARK joined in a dissenting opinion. Justice HARLAN wrote a dissenting opinion of his own.

How the Majority of this Court can feel so entirely at ease in its conclusion based on so varied a precedent is a mystery to me.

Under our system of case law a decision becomes a precedent for controlling other cases when the opinion of the Court, accepted by a majority of the judges, announces a definitive principle of law. If the decision

commands no majority projection of law it is rated as a "no-clear majority" decision which is binding only for its journal result. All that the *Gerstein* case really decides is that the decision of the Supreme Court of Florida which banned "Cancer" in Florida was reversed. Only speculation can guess as to what was really wrong with the Florida decision because, I repeat, there was no opinion filed by the Supreme Court. It, therefore, follows, if we have any rule of judicial interpretation in America, that *Gerstein* is no authority for what may or may not be done with "Cancer" in Pennsylvania.

Eugene Wambaugh, who was a Professor of Law at Harvard University, wrote in his book, The Study of Cases, that "Even when all the judges concur in the result, the value of the case as an authority may be diminished and almost wholly destroyed by the fact that the reasons given by the several judges differ materially."

He cites in this connection the case of *Dubuque v. Ill. R.R. Co.*, 39 Iowa 56, 80: "There must be a concurrence of a majority of the judges upon the principles, rules of law, announced in the case, before they can be considered settled by a decision. If the court be equally divided or less than a majority concur in a rule, no one will claim that it has the force of the authority of the court."

Henry Campbell Black, in his treatise on Law of Judicial Precedents, says: "If all or a majority of the judges concur in the result . . . but differ as to the reasons which lead them to this conclusion, the case is not an authority except upon the general result."

In view of these fundamental rules in the interpretation of judicial decisions, it is obvious that the Supreme Court of the United States, in the *Gerstein* case, left the door open as wide as the horizon for the State courts to determine for themselves whether so loath-

some a beast as "Cancer" should enter into the ark of the First Amendment protection. But this Court refused to see the door; instead, it looked out the narrow window of a restricted interpretation and declared that the *Gerstein* case locked our hands, fettered our minds, bound our conscience, gagged our expression and compelled us, with blindfolded eyes to follow a path that has no guidelines, no traveled surface and skirts the precipice of chaotic license. I refuse to go along. I prefer to follow the broad clean highway of decent literature, inspirational books, wholesomely entertaining stories, uplifting essays, enlightening histories and novels which one can read as easily as riding comfortably in a gondola—books which do not require one to don hipboots to slosh through muck, mire and filth which would make the pornographers of the early ages seem like a board of censors in comparison.

The Majority has missed a great opportunity to ring the Liberty Bell again for high moral standards. This was a case where the Court did not have to balance between literary excellence and moral turpitude in a book. It did not have to consider what the public might lose in being deprived of a work with some social value as against obscenity, because "Cancer" has no social worth whatever, it has no literary merit, and no information value. It is a scabious toad croaking obscene phrases in a pestiferous swamp of filth and degradation.

But even in the extreme hypothesis that the *Gerstein* case should be viewed as a precedent of some kind, it can never, under any circumstance, be regarded as protecting "Cancer" *under all circumstances and condition.* The Majority Opinion here, therefore, abdicates its responsibilities by arbitrarily stating that *Gerstein* is all controlling, all powerful and all omniscient.

Instead of analyzing the *Gerstein* and *Jacobellis* cases, in order to clarify the law in Pennsylvania on this subject, the Majority simply cites decisions from Connecticut, New York, Arizona and Illinois and then says that "the courts of those jurisdictions had occasion, subsequent to the Gerstein case, to comment on the book 'Tropic of Cancer' and in each instance held Gerstein was controlling and the circulation of the book could not be enjoined."

This statement is incorrect. The cases cited did not decide that "Cancer" could not be enjoined. "Cancer" was not the issue in any one of those cited cases. *State v. Huntington*, 204 A. 2d 411, had to do with an unnamed publication in issue; *City of Chicago v. Kimmel*, 201 N.E. 2d 386 had to do with two books "Campus Mistress" and "Born To Be Made"; *State v. Locks*, 397 P. 2d 949 dealt with unnamed magazines; and *Larkin v. G. P. Putnam's Sons*, 14 N.Y. 2d 399, considered the book called "Memoirs of a Woman of Pleasure." Although the *Gerstein* case was referred to in these decisions, it is incorrect to say that the courts declared that "Cancer" could not be enjoined.

In this respect it is of note to observe that the distinguished jurist, Chief Judge DESMOND, in the New York *Putnam's* case, wrote a vigorous dissenting opinion, in which he said that it has become the fashion of the day to "find literary values in any sexy writing" and to condemn as "Puritans and enemies of art and literature all those who try to preserve a modicum of public decency in our society. And into the law itself there has come from nowhere a new constitutional theory which licenses the most unrelieved sexual filth either on the theory of 'prevailing community standards' or on a finding of literary merit or social values." Then, with salubrious zeal, he declared: "I refuse to believe that all this can continue to be the law. I predict that the wheel will turn and the pen-

dulum swing back. Some time and somehow we will return to the historical meaning of 'Freedom of the Press.' *On that awaited day the courts will find it possible . . . to apply their oft-repeated holding that obscenity is an exception to the First Amendment's protections.*"

Judge SCILEPPI of the same Court said: "It is inconceivable that judicial thinking can become so beclouded by unwarranted fears and spurious cries of censorship as to result in giving constitutional protection to 'Memoirs of a Woman of Pleasure' by John Cleland. It is one of the foulest, sexually immoral, debasing, lewd and obscene books ever published, either in this country or abroad."

The quoted description, of course, applies equally well to "Cancer." The Judge indignantly continued: "The growing tendency to narrow the definition of obscenity and to demand impossible standards makes it virtually impossible to enforce any existing obscenity law or to enact any new legislation which can adequately protect our people from indecent and obscene publications. *This is an incredible result which cannot long stand, for an aroused public is sure to bring about a change in the attitude that 'anything goes' in the area of printed material and motion picture productions.*"

And then, the Majority Opinion speaks of *Gerstein* as if it were the last unchangeable word to be spoken on the subject of obscenity in literature. I refuse to accept the thought that once a decision is rendered on any particular subject, this means that the last bell has rung, the last whistle has blown, the last nail has been driven, the last rivet has been hammered, the last bus has departed, and all that is left to do is to wait until Judgment Day. Particularly on the subject here involved is there no such fatalism as would appear in the short ambit of the short Majority Opinion. In *Times Film Corporation v. City of Chicago,* 365 U.S.

43, the Supreme Court of the United States said: "In this perspective we consider the prior decisions of this Court touching on the problem. Beginning over a third of a century ago in Gitlow v. New York, 268 U.S. 652 (1925), *they have consistently reserved for future decision possible situations in which the claimed First Amendment privilege might have to give way to the necessities of the public welfare.* It has never been held that liberty of speech is absolute. Nor has it been suggested that all previous restraints on speech are invalid."

The Majority would ignore the possibility of situations in which the claimed First Amendment privilege would have to give way to the necessities of public welfare. It disregards the fundamental law that freedom of speech is not absolute.

In *Burstyn v. Wilson,* 343 U.S. 495, the Supreme Court said that motion pictures are within the guarantees of the First and Fourteenth Amendments, but that that was "not the end of the problem. *It does not follow that the Constitution requires absolute freedom to exhibit every motion picture of every kind at all times and all places.*"

Thus, it cannot be said, as the Majority Opinion might apparently imply, and as the defendants certainly argue, that there is no book which may not be prohibited by government in the fulfillment of its duties in serving the sovereign power, the people.

The Majority seems to overlook the fundamental observation that the long-honored standards of American decency are part of our national heritage. The patriots of the Revolutionary War fought just as bravely, and the colonial statesmen who built our structure of government, labored just as earnestly and valiantly, for moral cleanliness as they did to destroy political tyranny.

I regret that the action of the Supreme Court of Pennsylvania, the oldest Supreme Court in the nation, should result, not in Cancer's being consigned to the garbage can malodorously yawning to receive it, but, instead, in Cancer's being authorized unquestioned entry into the Public Library in Philadelphia within ringing distance of Independence Hall where the Liberty Bell rang out joyously the proclamation of the freedom, independence and *dignity of man*.

I would recoil in dismay if I attempted to visualize the reaction of the founding fathers if they could see this, one of the foulest books that ever disgraced printer's type, now taking a place on the library shelves with the Bible, Pilgrims' Progress, Shakespeare's Works, Plutarch's Lives, Homer's Iliad, Sir Thomas More's Utopia, Cervante's Don Quixote, Thomas Paine's Common Sense, and the other immortal books that inspired the brilliant architects, the brave leaders, the kneeling prayers, and the heroic soldiers who fashioned the United States of America.

From Pittsburgh to Philadelphia, from Dan to Beersheba, and from the ramparts of the Bible to Samuel Eliot Morison's Oxford History of the American People, I dissent!