[L. A. No. 28782. In Bank. July 3, 1967.]

JACK FLACK et al., Plaintiffs and Appellants, v. THE MUNICIPAL COURT FOR THE ANAHEIM-FULLERTON JUDICIAL DISTRICT OF ORANGE COUNTY, Defendant and Respondent.

Stanley Fleishman and Martha Goldin for Plaintiffs and Appellants.

Joseph B. Geisler, City Attorney, Lloyd J. Goldwater, John J. Gallagher and John F. F. Bovee, Deputy City Attorneys, for Defendant and Respondent.

MOSK, J.—In this action for writ of mandate we are called upon to determine whether law enforcement officers have used sufficiently "sensitive tools"[1] in attempting to curb alleged obscenity.

Plaintiffs (hereinafter called petitioners) appeal from an adverse judgment on their complaint for writ of mandate to compel respondent to return an allegedly obscene film seized at the time of their arrest. We are not called upon in this proceeding to ascertain whether the film is in law or fact obscene.

Petitioners contend that the seizure of the film without a search warrant or other judicial determination of the allegedly obscene character of the film, violates guarantees contained in the First Amendment of the United States Constitution by acting as a prior restraint on freedom of expression. For the reasons stated hereinafter, we conclude that the procedures employed in the present matter do violence to those constitutional protections and that the trial court should be directed to issue a writ of mandate as prayed.

Petitioner Flack is the owner of the Garden Theater in the City of Anaheim; petitioner Stephenson is employed at that theater. On April 27, 1965, the film "Sexus," apparently related to a Henry Miller book of the same title, was exhibited at the Garden Theater, as it had been for each night of the preceding two weeks. In the audience at the time were Officers Thomson and Finlay of the Anaheim Police Department. After viewing the film, and believing "that it constituted an exhibition of obscene matter," the officers arrested petitioners and seized the film. Neither search nor arrest warrants had previously been secured.

On April 28, 1965, each of the petitioners was charged in a two-count complaint with violations of Penal Code section

---

[1] "The separation of legitimate from illegitimate speech calls for . . . sensitive tools. . . ." (*Speiser* v. *Randall* (1958) 357 U.S. 513, 525 [2 L.Ed.2d 1460, 1472, 78 S.Ct. 1332].)

311.2 (exhibiting obscene matter) and section 650½ (outraging public decency). Demurrers were sustained without leave to amend as to the counts charging violation of section 650½; however, they were overruled as to the counts alleging violation of section 311.2. Motions were also made to suppress evidence and for return of the film which petitioners alleged was illegally seized at the time of their arrest. These motions were denied. Thereafter, petitioners filed a verified complaint in the Orange County Superior Court for a writ of mandate, praying that the Anaheim Municipal Court be ordered to direct the return of the film ''Sexus.'' An alternative writ issued; however, after a hearing, it was discharged and issuance of the peremptory writ was denied.

We are met at the threshold with respondent's contention that mandate will not lie to compel the return of property illegally seized, since, respondent asserts, a trial on the merits affords petitioners a plain, adequate and speedy remedy for the recovery of their film. Neither logic nor precedent impels us to this conclusion.

In *People* v. *Gershenhorn* (1964) 225 Cal.App.2d 122 [37 Cal.Rptr. 176] (hearing denied), the defendant was arrested for bookmaking at his place of business and evidence was seized incident to his arrest. Thereafter, the grand jury returned four indictments against the defendant and others. In the meantime, warrants had been obtained to search other premises, based in part on facts learned from the search of the defendant's premises at the time of his arrest. After he was indicted, the defendant unsuccessfully moved in the superior court to suppress the evidence seized at the time of his arrest and for an order to return the evidence to him. The Court of Appeal held that the superior court had jurisdiction to order a return of the evidence, reasoning that ''one whose property is illegally seized may desire not only to prevent its use against him in a criminal case, but also to procure its return. In that case, he may, either as an alternative to, or in conjunction with, a motion to suppress, move for its return as was done here. If the property was seized under a void warrant, or if it was not the property described in a warrant, such a motion is expressly authorized by section 1540 of the Penal Code. If the property was *illegally seized without a warrant*, the courts have allowed a similar motion.'' (Italics added.) (*Id.* at p. 125.) While the court dismissed the appeal because the order was nonappealable, it was careful to point out that ''Appellant is not, however, without remedy. Since

the order is not otherwise reviewable, a discretionary review by writ of mandate from this court is available." (*Id.* at p. 126.) Although *Gershenhorn* involved an allegedly invalid search warrant, the emphasized quotation above indicates mandate is also available in situations in which illegal seizures are made without warrants. To permit a summary remedy such as mandate when the police have acted with an invalid warrant, but deny redress when they proceed without a warrant, would penalize erroneous commission while rewarding deliberate or inept omission.

Any doubt on this subject should have been dispelled by our decision in *Ballard* v. *Superior Court* (1966) 64 Cal.2d 159 [49 Cal.Rptr. 302, 410 P.2d 838], a case in which no search warrant was involved. In *Ballard* the defendant sought the return of tape recordings which were alleged to have been illegally made by the police. Although this court denied the relief requested for the reason that the police owned the tape recordings, we pointed out that generally "one whose property has been illegally seized may obtain a writ of mandamus to compel the return of the property, if it is not contraband. . . . To protect a person from the deprivation of illegally seized property, which prevents him from using the property, the courts will afford a speedy determination of the legality of the seizure." (*Id.* at p. 165.)

Since *Ballard* is controlling, the propriety of the search and seizure here involved is properly before us. (See *Aday* v. *Superior Court* (1961) 55 Cal.2d 789, 799-800 [13 Cal.Rptr. 415, 362 P.2d 47] ; *Gershenhorn* v. *Superior Court* (1964) 227 Cal.App.2d 361, 364-365 [38 Cal.Rptr. 576] ; *Dunn* v. *Municipal Court* (1963) 220 Cal.App.2d 858, 867 [34 Cal.Rptr. 251] ; *Aday* v. *Municipal Court* (1962) 210 Cal.App.2d 229 [26 Cal.Rptr. 576] ; Cal. Criminal Law Practice (Cont. Ed. Bar 1964) §§ 5.11, 5.49, pp. 190, 212-213; Witkin, Cal. Criminal Procedure (1963) § 784, pp. 759-760 ; Comment, 54 Cal.L.Rev. (1966) 1070, 1075.)

Thus we turn to petitioners' contention that the seizure of the film violated rights guaranteed by the First Amendment since it occurred in the absence of a search warrant and without prior judicial determination of the issue of obscenity.

"Adjustment of the inevitable conflict between free speech and other interests is a problem as persistent as it is perplexing." (*Niemotko* v. *Maryland* (1951) 340 U.S. 268, 275 [95

L.Ed. 267, 272, 71 S.Ct. 325] [Frankfurter, J., concurring].)[2] Such an accommodation becomes particularly elusive if the message conveyed is alleged to be obscene. ▮▮▮ Since obscenity does not come within the ambit of protection afforded to speech by the First Amendment, the states remain free to regulate and suppress obscenity through the implementation of their police powers. (*Roth* v. *United States* (1957) 354 U.S. 476, 485 [1 L.Ed.2d 1498, 1507, 77 S.Ct. 1304]; *Beauharnais* v. *Illinois* (1952) 343 U.S. 250, 266 [96 L.Ed. 919, 932, 72 S.Ct. 725]; *Winters* v. *New York* (1948) 333 U.S. 507, 510 [92 L.Ed. 840, 847, 68 S.Ct. 665]; *Chaplinsky* v. *New Hampshire* (1942) 315 U.S. 568, 571-572 [86 L.Ed. 1031, 1035, 62 S.Ct. 766]; *Near* v. *Minnesota* (1931) 283 U.S. 697, 716 [75 L.Ed. 1357, 1367-1368, 51 S.Ct. 625]; *Zeitlin* v. *Arnebergh* (1963) 59 Cal.2d 901, 912 [31 Cal.Rptr. 800, 383 P.2d 152, 10 A.L.R.3d 707].) However, "under the Fourteenth Amendment, a State is not free to adopt whatever procedures it pleases for dealing with obscenity . . . without regard to the possible consequences for constitutionally protected speech." (*Marcus* v. *Search Warrant* (1961) 367 U.S. 717, 731 [6 L.Ed.2d 1127, 1135-1136, 81 S.Ct. 1708].)

Thus, in *Marcus* v. *Search Warrant* (1961) *supra,* 367 U.S. 717, a Missouri statutory scheme permitting the search for and seizure of allegedly obscene publications without a prior determination of obscenity was held to infringe upon those safeguards which the due process clause of the Fourteenth Amendment demands to assure constitutional protection to nonobscene material. Under the Missouri law, the warrant for a search and seizure of obscene material issued on a sworn complaint filed with a judge or magistrate. If issued upon a proper complaint, the warrant required that the described articles be brought immediately before the issuing magistrate, who then set a date, not less than five nor more than 20 days

---

[2]For background discussions in this area, see generally Magrath, *The Obscenity Cases: Grapes of Roth* (1966) Sup.Ct.Rev. 7; Mulroy, *Obscenity, Pornography and Censorship* (1963) 49 A.B.A.J. 869; Alpert, *Judicial Censorship of Obscene Literature* (1938) 52 Harv.L.Rev. 40; Green, *The Treatment of Obscenity* (1963) 51 Ky.L.J. 667; Lockhart & McClure, *Censorship of Obscenity: The Developing Constitutional Standards* (1960) 45 Minn.L.Rev. 5; Lockhart & McClure, *Literature, The Law of Obscenity, and the Constitution* (1954) 38 Minn.L.Rev. 295; Kalven, *The Metaphysics of the Law of Obscenity* (1960) Sup.Ct.Rev. 1; Note, *Obscenity and the Supreme Court: Nine Years of Confusion* (1966) 19 Stan.L.Rev. 167; Comment, *Free Speech and Obscenity: A Search for Constitutional Procedures and Standards* (1964) 12 U.C.L.A. L.Rev. 532 (insightful analysis of the diverse state methods of controlling obscenity and their treatment by the United States Supreme Court).

after the seizure, for a hearing to determine whether the seized material was obscene. The owner of the material was entitled to appear at such hearing and defend against the charge. If the judge found the material obscene, he was required to order it to be publicly destroyed; if he found it was not obscene, he ordered its return to its owner.

The Supreme Court disapproved of the Missouri procedure because it authorized a court to issue a warrant for search and seizure on the sworn complaint of a police officer stating facts indicating that "obscene material" was being kept in any place or building, without scrutiny by the court of any materials considered by the complainant to be obscene, and the warrant gave the broadest discretion to police officers executing it, leaving to the individual judgment of each the selection of such materials as were in his view obscene.[3]

In *A Quantity of Books* v. *Kansas* (1964) 378 U.S. 205 [12 L.Ed.2d 809, 84 S.Ct. 1723], a Kansas procedure for the suppression of allegedly obscene books was held unconstitutional. Under the Kansas statutes warrants for search and seizure were issued *ex parte* solely "upon information and belief." To avoid conflict with *Marcus,* Kansas authorities went beyond their statutory requirements in an endeavor to protect the validity of the seizure. Thus, a judge issued the requested warrant only after he had examined six of the 59 books named in the warrant and had determined that they "appear[ed] to be obscene." Despite these procedures the Supreme Court disapproved, with a plurality of the court concluding "that in not first affording P-K [petitioner] an adversary hearing, the procedure leading to the seizure order was constitutionally deficient."[4] (378 U.S. at p. 211, 12 L.Ed.2d at p. 813.)

A mass seizure pursuant to a warrant describing petitioner's home and authorizing the search and seizure of

---

[3]See also, *Commonwealth* v. *Dorius* (1963) 346 Mass. 323 [191 N.E.2d 781] (relying on *Marcus,* and holding overly broad a warrant authorizing search for articles described as "containing indecent, impure or obscene language"); *In re Search Warrant of Property* (Mo. 1963) 369 S.W.2d 155 (holding constitutionally deficient a search warrant that contained only recitals identical with statutory provisions authorizing issuance of such a warrant for obscene material); *State* v. *Hudson County News Co.* (1963) 41 N.J. 247 [196 A.2d 225] (condemning mass seizure of material pursuant to warrant authorizing search for obscene matter.)

[4]See also, *United States* v. *18 Packages of Magazines* (N.D. Cal. 1964) 238 F.Supp. 846; *People* v. *Kimmel* (1966) 34 Ill.2d 578 [217 N.E.2d 785]; *State* ex rel. *Londerholm* v. *A Quantity of Copies of Books* (1966) 197 Kan. 306 [416 P.2d 703]; revd. per curiam, 388 U.S. 452 [18 L.Ed.2d 1314, 87 S.Ct. 2104].

" 'books, records, pamphlets, cards, receipts, lists, memoranda, pictures, recordings and other instruments concerning the Communist Party of Texas' '' was condemned by the Supreme Court in *Stanford* v. *Texas* (1965) 379 U.S. 476 [13 L.Ed.2d 431, 85 S.Ct. 506]. Resting its decision on the Fourth and Fifth Amendments as well as the First, the court declared that "the constitutional requirement that warrants must particularly describe the 'things to be seized' is to be accorded the most scrupulous exactitude when the 'things' are books, and the basis for their seizure is the ideas which they contain. See *Marcus* v. *Search Warrant*, 367 U.S. 717 [6 L.Ed.2d 1127, 81 S.Ct. 1708] ; *A Quantity of Books* v. *Kansas*, 378 U.S. 205 [12 L.Ed.2d 809, 84 S.Ct. 1723]. No less a standard could be faithful to First Amendment freedoms. The constitutional impossibility of leaving the protection of those freedoms to the whim of the officers charged with executing the warrant is dramatically underscored by what the officers saw fit to seize under the warrant in this case." (379 U.S. at p. 485, 13 L.Ed.2d at p. 437.)

The foregoing authorities were concerned with seizure of literature. Respondent here suggests that a less protective standard applies to motion pictures.[5] While this concept prevailed a half century ago when the United States Supreme Court held in *Mutual Film Corp.* v. *Ohio Industrial Com.* (1915) 236 U.S. 230 [59 L.Ed. 552, 35 S.Ct. 387], that movies were purely business undertakings and in no sense related to the press, it was specifically disapproved in *Joseph Burstyn, Inc.* v. *Wilson* (1952) 343 U.S. 495, 502 [96 L.Ed. 1098, 1106, 72 S.Ct. 777]. Justice Clark wrote that "we conclude that expression by means of motion pictures is included within the free speech and free press guaranty of the First and Fourteenth Amendments."[6]

---

[5] "Perhaps the censors, despite their history of continuous attack upon the printed word, really didn't put much faith in the effects of reading on the public. Perhaps they were farsighted enough to realize the great attraction movies were to become. . . . At any rate, whatever the reason, they applied to movies perhaps the most severe method of intellectual suppression known in modern times—prior restraint." (Ernst and Schwartz, Censorship—The Search for the Obscene (1964) p. 143.)

[6] "Compared with the long history of the printed word, the emergence of the screen as a full-fledged agency of mass communication has been very rapid." (Inglis, Freedom of the Movies (1947).) Miss Inglis' text was a phase of the work of the Commission on Freedom of the Press, which undertook a thorough study pursuant to grants made by Time Magazine and the Encylopedia Britannica to the University of Chicago. One conclusion of the Commission: "The constitutional guarantees of freedom of the press should be recognized as including motion pictures."

*Freedman* v. *Maryland* (1965) 380 U.S. 51 [13 L.Ed.2d 649, 85 S.Ct. 734], involved the validity of a state motion picture censorship system. The citation by the court in that case of *Marcus* and *A Quantity of Books* v. *Kansas* makes clear that their holdings, as well as that of *Stanford,* are as appropriately applicable to motion pictures as to literature.[7]

Although *Marcus, Quantity of Books,* and *Stanford* all dealt with search warrants issued under civil rather than criminal proceedings,[8] their common thread seems clear: since obscenity is often separated from constitutionally protected expression by only a "dim and uncertain line" (*Bantam Books, Inc.* v. *Sullivan* (1963) 372 U.S. 58, 66 [9 L.Ed.2d 584, 590, 83 S.Ct. 631]), purported obscenity maintains, until such time as it is judicially determined to be unprotected speech, the same "preferred position" as does free speech generally (*Murdock* v. *Pennsylvania* (1943) 319 U.S. 105, 115 [87 L.Ed. 1292, 1300, 63 S.Ct. 870, 146 A.L.R. 81]), and the ordinary rules of search and seizure are inapplicable to it. Thus,

---

[7]There is language in some cases suggesting that motion pictures may constitutionally be subjected to a greater degree of prior restraint than books. (See *Freedman* v. *Maryland* (1965) *supra,* 380 U.S. 51, 60-61 [13 L.Ed.2d 649, 655-656, 85 S.Ct. 734]; *Times Film Corp.* v. *City of Chicago* (1961) 365 U.S. 43, 49-50 [5 L.Ed.2d 403, 407-408, 81 S.Ct. 391]; *Joseph Burstyn, Inc.* v. *Wilson* (1952) *supra,* 343 U.S. 495, 501-503 [96 L.Ed. 1098, 1105-1107, 72 S.Ct. 777].) However, as noted in *United States* v. *One Book Entitled "The Adventures of Father Silas"* (S.D. N.Y. 1966) 249 F.Supp. 911, 918, fn. 13, "There may, on the other hand, be economic or other reasons for arguing that delayed distribution of motion pictures inflicts more serious harm than delayed sale or delivery of books. Cf. Emerson, *The Doctrine of Prior Restraint,* 20 Law and Contemp. Prob. 648, 669 (1955). In the end, however, it is surely no less clear for the written word than for other forms of expression that 'limitation is the exception; it is to be closely confined so as to preclude what may fairly be deemed licensing or censorship.' *Kingsley Books, Inc.* v. *Brown,* 354 U.S. 436, 441 [1 L.Ed.2d 1469, 1474, 77 S.Ct. 1325, 1328] (1957)." (See also Freund, *The Supreme Court and Civil Liberties* (1951) 4 Vand.L.Rev. 533, 537-545.)

Prior censorship of television films has been consistently rejected, but primarily on the ground of federal preemption. (See *Allen B. Dumont Laboratories* v. *Carroll* (E.D.Pa. 1949) 86 F.Supp. 813, cert. den., 340 U.S. 929 [95 L.Ed. 670, 71 S.Ct. 490]; Notes (1950) 98 U. of Pa.L. Rev. 429, (1949) 35 Va.L.Rev. 1092.)

[8]It cannot be said that searches pursuant to criminal obscenity proceedings are any less onerous a prior restraint than those made in connection with civil *in rem* actions against the obscene matter itself. As observed by the court in *Evergreen Review, Inc.* v. *Cahn* (E.D.N.Y. 1964) 230 F.Supp. 498, 504, "It would be illogical and inconsistent to suppose that prior restraints upon distribution of publications would be unconstitutionally tainted under a . . . civil proceeding, yet be free from such taint under a . . . conventional criminal proceeding." (See also *Redrup* v. *New York* (1967) 386 U.S. 767, 770 [18 L.Ed.2d 515, 518, 87 S.Ct. 1414].)

allegedly obscene material cannot be treated in the same manner as contraband such as narcotics and burglar tools for purposes of search and seizure. (*Marcus* v. *Search Warrant* (1961) *supra*, 367 U.S. 717, 730-731 [6 L.Ed.2d 1127, 1135-1136, 81 S.Ct. 1708].)

California cases also recognize the special nature of searches and seizures of materials that are alleged to be obscene. In *Aday* v. *Municipal Court* (1962) 210 Cal.App.2d 229 [26 Cal.Rptr. 576], a search warrant was issued authorizing the search and seizure of purported obscenity described generally, as well as two specified books and magazines. On the authority of *Marcus* the Court of Appeal granted a writ of mandate requiring the return to the petitioners of the numerous books and business records eventually seized under the warrant. In so doing, the court interpreted *Marcus* as coming "down to this: An exploratory search and seizure of literary property, not supported or supportable by a valid search warrant, which is followed by immediate and prolonged sequestration of seized articles without the sanction of a court hearing based upon factual evidence as to obscenity, effects a prior restraint upon freedom of speech or press and constitutes a denial of procedural due process of law, which renders all seized properties the 'fruits of a poisonous tree.' " (210 Cal.App.2d at pp. 246-247.) Continuing, the court held "that the rationale of the *Marcus* opinion requires that a determination of the question of obscenity be made after hearing of factual evidence (if requested) and before the trial of the case; that the seized property cannot be used in evidence against the owner unless it has been previously established in such factual hearing to be contraband." (*Id.* at p. 249.)[9]

While it is settled that in the ordinary case a search incident to an arrest is not "unreasonable" if the arrest itself is lawful (*United States* v. *Rabinowitz* (1950) 339 U.S. 56 [94 L.Ed. 653, 70 S.Ct. 430]; *Agnello* v. *United States* (1925) 269 U.S. 20 [70 L.Ed. 145, 46 S.Ct. 4, 51 A.L.R. 409]; *People* v. *Harris* (1965) 62 Cal.2d 681, 683 [43 Cal.Rptr. 833, 401 P.2d 225]; *People* v. *Winston* (1956) 46 Cal.2d 151, 162 [293 P.2d

___

[9] *Aday*, coming as it did prior to *Quantity of Books, Stanford*, and *Freedman*, adopted an appropriate statement of the rule to be followed at that time and under the facts of that case. However, *Aday* involved the use of an overly broad search warrant, and some of the articles which were seized actually fell outside the description contained in the warrant. Thus the court in *Aday* had no occasion to consider the problem of a warrantless search such as is involved in the instant matter.

40]), the First Amendment compels more restrictive rules in cases in which the arrest and search relate to alleged obscenity. ▮ The lesson of *Marcus, Quantity of Books, Stanford,* and *Aday* is that since constitutionally protected speech is involved, *"Determination by police officers* of the status of suspected books, papers, etc.—whether to be classified as obscene or not obscene—*is not enough protection* to the owner to constitute due process." (Italics added.) (*Aday* v. *Municipal Court* (1962) *supra,* 210 Cal.App.2d 229, 247.)

▮ Thus, with the exception of a situation involving a legitimate emergency,[10] even if the search is contemporaneous with an arrest, a search warrant must be secured prior to any search for or seizure of material alleged to be obscene.[11] It is

---

[10] We conceive of a legitimate emergency arising in arrest situations involving a high probability that evidence may be lost, destroyed, or spirited away. The one-night surreptitious screening of a film at a locked-door "stag" party may under appropriate circumstances justify seizure without a warrant. It is clear that in the instant case, involving a showing at a public theater for two weeks, no emergency existed.

[11] The holdings on this issue in other jurisdictions, to the extent they are apposite, are conflicting. Thus, in *People* v. *Matherson* (1965) 260 N.Y.S.2d 448, 448-449, the New York Court of Appeals held, in a case involving obscene material seized incident to arrest, "The seizure of evidence upon which the conviction is based was an incident to a lawful arrest on sufficient cause in a place open to public access. Therefore, the fact a search warrant was defective, as the People concede, because it was a general warrant [citations] did not preclude the reception in evidence of exhibits seized as an incident to the arrest." (See also, *People* v. *Reshes* (Crim.Ct. N.Y. City 1963) 39 Misc.2d 723 [242 N.Y.S.2d 416]; but cf. *Stengel* v. *Smith* (1963) 18 App.Div.2d 458 [240 N.Y.S.2d 200].) To the same effect are *State* v. *Vollmar* (Mo. 1965) 389 S.W.2d 20; *United States* v. *Peisner* (4th Cir. 1962) 311 F.2d 94, 105; *Schackman* v. *Arnebergh* (C.D.Cal. 1966) 258 F.Supp. 983, dismissed for lack of jurisdiction, 387 U.S. 427, 18 L.Ed.2d 865, 87 S.Ct. 1622].

On the other hand, the court in *State* v. *Parisi* (1962) 76 N.J.Super. 115 [183 A.2d 801, 805], reviewed relevant United States Supreme Court decisions and concluded: "In the area of criminal law which embraces the obscene a situation completely different from that concerning crimes involving overt antisocial conduct exists. Even if we should accept as applicable in these cases the standard for determining the existence of probable cause, as set forth in *Brinegar, supra* [*Brinegar* v. *United States,* 338 U.S. 160 (93 L.Ed. 1879, 69 S.Ct. 1302)], that it is the factual and practical considerations of everyday life on which reasonable and prudent men might act which are germane, it is at once apparent that the majority of law enforcement officers are hardly equipped to determine that material observed is probably obscene. The application of the test laid down in *Roth,* by the admission of the Supreme Court, is one of complexity. The person applying the test must balance his view of the content of the material under examination, judging its patent offensiveness and prurient interest appeal, *Manual Enterprises, Inc.* v. *Day,* 370 U.S. 478 [8 L.Ed.2d 639, 82 S.Ct. 1432], against the interest of society as a whole in the protection of the fundamental constitutional guarantee of freedom of expression. In its application, the test cannot be diluted in any manner by the personal dislikes or personal moral judgments of the

incongruous to condemn, as vesting too abundant discretion in the enforcing officer, a search and seizure made on an overly broad warrant (see *Aday* v. *Municipal Court* (1962) *supra*, 210 Cal.App.2d 229), while permitting officers an unfettered discretion in seizures effected without a warrant under the guise of being incident to arrest. In both circumstances constitutionally compelled procedural safeguards are lacking. Within the precinct of the First Amendment, only the requirement that a search warrant be obtained prior to any search or seizure assures a free society that the sensitive determination of obscenity will be made judically and not *ad hoc* by police officers in the field.[12] ■ It has always been recognized that "the more important the rights at stake the more important must be the procedural safeguards surrounding those rights." (*Speiser* v. *Randall* (1958) *supra*, 357 U.S. 513, 520-521 [2 L.Ed.2d 1460, 1469, 78 S.Ct. 1332].)

The concept of placing an intervening impartial tribunal between the enforcing officer and his target is not alien to this court in cases having First Amendment overtones. In *Sokol* v. *Public Utilities Com.* (1966) 65 Cal.2d 247 [53 Cal.Rptr. 673, 418 P.2d 265], a commission rule requiring a communications utility to summarily discontinue service to a subscriber if advised by any law enforcement agency that the service is being used for unlawful purposes was invalidated unani-

person applying it. I do not believe that the First and Fourteenth Amendments permit the exercise of judgment *ex parte* by law enforcement officers when they are called upon to deal with materials allegedly obscene.

"The officers involved here took it upon themselves, without prior judicial approval, to seize material which in their judgment violated the obscenity law. The only basis for the formation of this judgment was, by admission, the determination made by Detective Magnusson. I do not for one moment question the officer's good faith in this regard. In my opinion he was called upon to perform a task which was impossible for him to perform. The issue here, however, is not the good faith of the officers involved, but rather whether sufficient protection was afforded to freedom of expression under the procedures employed.

"Since no warrant was obtained in these proceedings and, therefore, no judicial determination was made as to probable cause with regard to a violation of N.J.S. 2A: 115-2, N.J.S.A., it is my conclusion that defendants' motions to suppress must be granted. Implicit in this conclusion is my belief that probable cause *for a violation of the obscenity laws cannot be deemed to exist by a law enforcement official acting on his own behalf. The intervention of a judicial mind for the determination of probable cause in these cases is, in my opinion, an absolute necessity.*" (Italics added.) (See also *Evergreen Review, Inc.* v. *Cahn* (E.D.N.Y. 1964) *supra*, 230 F.Supp. 498, 504-505.)

[12]Since they contain contrary conclusions, *People* v. *Campise* (1966) 242 Cal.App.2d Supp. 905 [51 Cal.Rptr. 815], and *People* v. *Culbertson* (1966) 242 Cal.App.2d Supp. 916 [51 Cal.Rptr. 822], are disapproved.

mously because the rule did not "conform to the due process requirements of the state and federal Constitutions in that it provides for no review of the bare allegations of the police prior to the termination of service." (*Id.* at p. 256.)

Since no search warrant was obtained here, although the film had been exhibited to the public at the same theater for two weeks and ample opportunity existed for seeking a warrant, the seizure was invalid.[13]

Law enforcement agencies[14] insist that no one can be oblivious to the problem that obscenity poses to modern society.[15]

But as Chief Justice Warren observed in his dissent in *Jacobellis* v. *Ohio* (1964) 378 U.S. 184, 202 [12 L.Ed.2d 793, 806, 84 S.Ct. 1676], "courts are often presented with procedurally bad cases and, in dealing with them, appear to be acquiescing in the dissemination of obscenity. But if cases were well prepared and were conducted with the appropriate concern for constitutional safeguards, courts would not hesitate to enforce the laws against obscenity. Thus, enforcement agencies must realize that there is no royal road to enforcement; hard and conscientious work is required."

The judgment discharging the alternative writ of mandate and denying the peremptory writ is reversed, and the trial court is instructed to issue the peremptory writ as prayed.

Traynor, C. J., Peters, J., Tobriner, J., Burke, J., and Sullivan, J., concurred.

---

[13]No warrant being involved here, we have none to evaluate and thus do not reach the problem of determining the necessary content of a warrant. Nor do we here ascertain whether it is feasible for the magistrate to examine the allegedly offending film or hold an adversary proceeding prior to issuing a warrant, as suggested by four justices in *A Quantity of Books* v. *Kansas* (1964) *supra*, 378 U.S. 205.

[14]A recent report of the Attorney General of California asserts that this state, and more particularly the Los Angeles area, is a central source nationally of obscene materials. (See Report of the Attorney General (1967) *Obscenity: The Law and the Nature of the Business*, pp. 25-26.)

[15]But obscenity is not a problem related exclusively to this modern generation. A century and a half ago Thomas Jefferson also deplored obscenity and its corrupting effect upon society, but reached a somewhat different conclusion: "I deplore . . . the putrid state into which our newspapers have passed, and the malignity, the vulgarity, and the mendacious spirit of those who write them. . . . These ordures are rapidly depraving the public taste. It is, however, an evil for which there is no remedy: our liberty depends on the freedom of the press and that cannot be limited without being lost." (See Konvitz, Bill of Rights Reader (1954) p. 412.)

McCOMB, J.—I dissent. I would affirm the judgment for the reasons expressed by Mr. Justice pro tem. Finley in the opinion prepared by him for the Court of Appeal in *Flack* v. *Municipal Court of Anaheim-Fullerton Jud. Dist.* (Cal.App.) 56 Cal.Rptr. 162.

Respondent's petition for a rehearing was denied July 26, 1967. McComb, J., was of the opinion that the petition should be granted.