63 Cal.Rptr. 680]

Appellate Department, Superior Court, Los Angeles

[Crim. Nos. 7573, 7574. Oct. 26, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. WILLIAM PINKUS, Defendant and Appellant.

(Two Cases.)

Atkins & Jacobson for Defendant and Appellant.

Roger Arnebergh, City Attorney, Philip E. Grey, Assistant City Attorney, and Michael T. Sauer, Deputy City Attorney, for Plaintiff and Respondent.

AISO, P. J.—Defendant William Pinkus was found guilty by a jury of violating Penal Code, section 311.2[1] on July 14, 1966, and on October 19, 1966, in the City of Los Angeles. Pinkus appeals from the respective judgments of conviction pronounced upon the guilty verdicts entered upon two counts.

The counts, respectively, are: count I of the amended complaint in CR A 7573 (trial court No. 269648) which originally set forth a total of 13 counts, and renumbered count I of the amended complaint in CR A 7574 (trial court No. 270712, originally count II thereof and renumbered count I at time of trial) which originally set forth 3 separate counts. The two cases were consolidated for trial and appeal. This appeal concerns only the two counts enumerated above on which defendant Pinkus was convicted.

Count I of CR A 7573 involves an 8mm. silent film received into evidence as Exhibit 2, marked "J." Renumbered count I of CR A 7574 involves the 8mm. silent films received into evidence as Exhibit 13 (consisting of 113 such films). The 8mm. film marked "J" and two films from the 113, constituting Exhibit 13 identified as "B-6" and "B-8," were shown to the jury with accompanying stipulation that the two shown "represent the worst, and that there are some that are milder; but certainly none are stronger" than the two shown.

We have viewed the films shown the jury in course of reviewing the entire record as enjoined by higher courts. (*Jacobellis* v. *Ohio* (1964) 378 U.S. 184, 188-189 [12 L.Ed.2d 793, 798-799, 84 S.Ct. 1676]; *Zeitlin* v. *Arnebergh* (1963) 59 Cal.2d 901, 909 [31 Cal.Rptr. 800, 383 P.2d 152, 10 A.L.R.3d 707].) Each of the three films viewed constitutes, in our opinion, "hard-core pornography." Significantly, defendant's counsel raised no issue in his brief as to these three films being obscene and he confirmed in oral argument that the omission was not inadvertent.

---

[1]Penal Code, section 311.2: "Every person who knowingly: sends or causes to be sent, or brings or causes to be brought, into this State for sale or distribution, or in this State prepares, publishes, prints, exhibits, distributes, or offers to distribute, or has in his possession with intent to distribute or to exhibit or offer to distribute, any obscene matter is guilty of a misdemeanor."
Penal Code, section 311, subdivision (b): "'Matter' means . . . motion picture . . . ."

Grounds assigned for reversal of the judgments of conviction are: (1) the evidence is the product of illegal searches and seizures, (2) obscenity was not established in that the prosecution introduced no evidence of obscenity other than the films exhibited to the jury, and (3) the requirements of scienter defined by Penal Code, section 311, subdivision (e)[2] were not met.

Facts relevant to these issues will be set forth as we consider each assignment seriatim.

### EVIDENCE LEGALLY OBTAINED

There is no question as to any illegal search and seizure as to the film in CR A 7573 (Exhibit 2, marked "J"). It was purchased by Officer Philip K. Roberts at the defendant's "BOOKS. MAGAZINES. FILM" shop[3] (ROSSLYN NEWS Co.), 450 South Main Street, Los Angeles, on July 14, 1966, although defendant Pinkus was not there at the time.

The 113 films in CR A 7574 (Exhibit 13) were obtained by the police under the following circumstances on October 21, 1966: Officer Joseph B. Fingleton went to the defendant's store with warrants for the arrest of defendant Pinkus and one Ronald Kamin, each for a violation of Penal Code, section 311.2. Kamin was tending the store at the time and was arrested. Defendant Pinkus was not there. A search of the store was made contemporaneously with Kamin's arrest. The films making up Exhibit 13 were found and seized at that time. Thirty-three rolls of film [10 rolls of "B-6," 10 rolls of "B-7," 13 rolls of "B-8"] were found upstairs on a table in a "back-room like" area. Seventy-nine rolls of film [6 rolls of "B-6," 2 rolls "B-8," and other films of similar nature] were found on shelves open to public view underneath a glass counter.

The validity of the warrants of *arrest* has not been attacked either in the trial court or upon this appeal. Defense counsel urges only that since there was time to obtain a *search* warrant, the officers should have been armed with a *search* warrant in addition to the *arrest* warrants. He urges here that *Flack* v. *Municipal Court* (1967] 66 Cal.2d 981 [59 Cal. Rptr. 872, 429 P.2d 192], decided subsequent to the trial of

---

[2]Penal Code, section 311, subdivision (e): " 'Knowingly' means having knowledge that the matter is obscene."

[3]Although defendant disputed ownership of the store, the jury on substantial evidence found against him. (See, e.g., *People* v. *Newland* (1940) 15 Cal.2d 678, 681 [104 P.2d 778]; *People* v. *Moore* (1955) 137 Cal.App.2d 197, 200-201 [290 P.2d 40]; *People* v. *Prezas* (1961) 195 Cal. App.2d 850, 853 [16 Cal.Rptr. 274].)

these cases here but pending appeal, has somehow rendered the seizure of Exhibit 13, contemporaneous with the arrest pursuant to a warrant of *arrest,* illegal. We do not understand the holding of *Flack* to be so broad. In *Flack* "neither search nor arrest warrants had previously been secured." (*Flack* v. *Municipal Court, supra,* 66 Cal.2d 981, 984.) We do not feel that where officers make an arrest pursuant to a warrant issued for a violation of Penal Code, section 311.2, there should be any exception from the general rule that instrumentalities for the commission of the crime or proof of guilt may be seized incidental to the arrest. (*United States* v. *Rabinowitz* (1950) 339 U.S. 56, 60-61 [94 L.Ed. 653, 657-658, 70 S.Ct. 430]; *Harris* v. *United States* (1947) 331 U.S. 145, 151-153 [91 L.Ed. 1399, 1405-1406, 67 S.Ct. 1098]; *People* v. *Winston* (1956) 46 Cal.2d 151, 162 [293 P.2d 40]; and cf. *Maryland Penitentiary* v. *Hayden* (1967) 387 U.S. 294 [18 L.Ed.2d 782, 87 S.Ct. 1642]; *People* v. *Thayer* (1965) 63 Cal.2d 635 [47 Cal.Rptr. 780, 480 P.2d 108] sanctioning seizure of mere evidence establishing elements of the crime.)

Furthermore, there were circumstances present here that the films might well have disappeared from the premises at 450 South Main Street if not seized immediately. A defense witness, John Adams, who had worked as a clerk at the Rosslyn News Co. at 450 South Main Street during July, August, September and October of 1966, testified that he would take the inventory for the store at 450 from another shop, the "Main Street News," located at 516 South Main Street where the inventory or stock was kept. And when the Rosslyn News Co. at 450 South Main Street "was closed," he (Adams) would take the inventory on hand at 450 South Main Street back to the store at 516 South Main Street. The arrest of Kamin surely would have been a sufficient tip-off to strip the store at 450 Main Street of the obscene inventory. The *Flack* case itself recognized an exception to the general rule there stated in "arrest situations involving a high probability that evidence may be lost, destroyed, or spirited away." (*Flack* v. *Municipal Court, supra,* 66 Cal.2d 981, 991, fn. 10.)

We, therefore, hold that defendant's claim, that Exhibits 2 and 13 were obtained by illegal search and seizure, lacks merit.

### EVIDENCE ADEQUATELY SUPPORTS FINDING OF OBSCENITY

The constitutional and statutory criteria and other pertinent considerations in adjudicating a silent motion picture

946

obscene are set forth in *Landau* v. *Fording* (1966) 245 Cal. App.2d 820 [54 Cal.Rptr. 177], cert. granted, judgment affirmed, 388 U.S. 456 [18 L.Ed.2d 1317, 87 S.Ct. 2109].

█ Defendant's contention that "There was absolutely no evidence from which the jury could find the requisite elements of obscenity as enunciated in section 311 subdivision (a) of the Penal Code; i.e., no *corpus delicti* was established" is difficult to reconcile with his position that he does not contest Exhibits 2 and 13 (two therefrom shown to the jury) being obscene. Citing *United States* v. *Klaw* (2d Cir. 1965) 350 F.2d 155, defendant contends that obscenity cannot be established without expert opinion testimony that the matter[4] in question meets the elements which must coalesce to render a film obscene. We do not agree. *Klaw* involved matters appealing only to deviants and not to the normal average person applying contemporary community standards. Where no such deviancy was involved, the same court[5] held to the contrary in a case where the matter consisted of "party records." (*United States* v. *Davis* (2d Cir. 1965) 353 F.2d 614, cert. denied, 384 U.S. 953 [16 L.Ed.2d 549, 86 S.Ct. 1567].)

Here these "stag party" type films exhibited to the jury constitute evidence against themselves. Exhibit 2 is in color. The two films from Exhibit 13, exhibited to the jury, are in black and white. Each shamelessly depicts a young woman stripping absolutely naked; brazenly and shamelessly displaying breasts, genitalia, pubic hairs, and the anal area; and engaging in masturbation or motions and gyrations simulating a female in sex play and sexual intercourse. There is no story line, plot, or social message, but only a dreary repetition of the shocking, morbid, and shameful acts described. None of the three films is so esoteric that expert opinion evidence is necessary to interpret it to the average juror. The determination of obscenity, therefore, by the jury upon the basis of viewing Exhibits 2 and 13 and guided by proper instructions by the court was proper. (*Kahm* v. *United States* (5th Cir. 1962) 300 F.2d 78, 84, .cert. denied, 369 U.S. 859 [8 L.Ed.2d

[4]Penal Code, section 311, subdivision (a) uses the term "matter" instead of the word "material" normally used in legal literature outside this state.

[5]In *Klaw* the court was composed of Circuit Judges Waterman, Moore and Smith. In *Davis,* it consisted of Chief Judge Lumbard and Circuit Judges Waterman and Friendly. The *Davis* decision was a split decision with Judge Waterman dissenting. Compare *People* v. *G.I. Distributors, Inc.* (1967) 20 N.Y.2d 104 [281 N.Y.S.2d 795, 228 N.E.2d 787], cert. denied by United States Supreme Court (Oct. 16, 1967) 389 U.S. 905 [19 L.Ed.2d 219, 88 S.Ct. 218].

18, 82 S.Ct. 949]; *United States* v. *Davis, supra,* 353 F.2d 614, 615, cert. denied, 384 U.S. 953 [16 L.Ed.2d 549, 86 S.Ct. 1567]; *Womack* v. *United States* (D.C.Cir. 1961) 294 F.2d 204, 205 [111 App.D.C. 8]; cf. *People* v. *Moskovitz* (1967) CR A 7293, trans. denied by Court of Appeal.)

While expert opinion evidence is competent evidence in cases of this kind (*In re Harris* (1961) 56 Cal.2d 879 [16 Cal.Rptr. 889, 366 P.2d 305]; *Landau* v. *Fording, supra,* 245 Cal.App.2d 820, cert. granted, judgment affirmed, 388 U.S. 456 [18 L.Ed.2d 1317, 87 S.Ct. 2109]), there is no constitutional requirement that expert testimony must be adduced where the necessary elements can be established by other means of proof (*Smith* v. *California* (1959) 361 U.S. 147, 172-173 [4 L.Ed.2d 205, 221-222, 80 S.Ct. 215], Harlan, J., concurring and dissenting). (See also *People* v. *Williamson* (1962) 207 Cal.App.2d 839, 847 [24 Cal.Rptr. 734].)

Here the jury was drawn from citizens of the cities of Los Angeles and San Fernando. "The jury represents a cross-section of the community and has a special aptitude for reflecting the view of the average person. Jury trial of obscenity therefore provides a peculiarly competent application of the standard for judging obscenity which, by its definition, calls for an appraisal of material according to the average person's application of contemporary community standards." (*Kingsley Books, Inc.* v. *Brown* (1957) 354 U.S. 436, 448 [1 L.Ed.2d 1469, 1478, 77 S.Ct. 1325], Brennan, J.,[6] dissenting.) A "State is not debarred from regarding the trier of fact as the embodiment of community standards, competent to judge a challenged work against those standards. . . ." (*Smith* v. *California* (1959) 361 U.S. 147, 172 [4 L.Ed.2d 205, 221, 80 S.Ct. 215], Harlan, J., concurring and dissenting).

The jury were properly instructed; they were not left to speculate as claimed by defendant. One of the instructions given was: "The material complained of is to be judged with reference to the average adult person applying contemporary standards. Thus, your own personal and social views on material such as that charged in the complaint may not be

---

[6] Justice Brennan is the author of the court's opinion in *Roth* v. *United States* (1957) 354 U.S. 476 [1 L.Ed.2d 1498, 77 S.Ct. 1304] and *Memoirs* v. *Massachusetts* (1966) 383 U.S. 413 [16 L.Ed.2d 1, 86 S.Ct. 975], and of the opinion in *Jacobellis* v. *Ohio, supra,* 378 U.S. 184, 192-195 [12 L.Ed.2d 793, 800-802] joined in by Justice Goldberg, holding that contemporary community standards means the standard of " 'society at large; . . . the public, or people in general. . . . a national standard.'"

considered. Whether you believe that the material is good or bad is of no concern; so, too, you may not consider whether in your opinion the material is moral or immoral; whether it is likely to be helpful or injurious to the public morals. Similarly, whether you personally like or dislike the material; whether it personally offends or shocks you may not be considered by you.

"The contemporary standards to which the law makes reference is set by what is in fact accepted and not by what some persons or groups of persons may believe the community as a whole ought to accept or refuse to accept. In determining and applying the contemporary standards you have a right to consider what, candidly and openly appears in magazines, books, newspapers and other media of communication. Contemporary standards are not the standards of a particular locality or geographical area; rather, they are standards of our society at large. They are national rather than local standards."[7]

The findings of obscenity as to the respective films exhibited to the jury were therefore adequately supported by the evidence and properly made.

### Scienter Requirement of Penal Code Section 311, Subdivision (e) Fulfilled

Penal Code, section 311, subdivision (e) provides: " 'Knowingly' means having knowledge that the matter is obscene."

Defendant contends that this knowledge requirement was not fulfilled, because (1) the trial court erred in instructing the jury, " 'Knowingly' is having knowledge that the matter is obscene, that is, the defendant must have known the

---

[7]We are aware that Chief Justice Warren and Justice Clark dispute the existence of a "national standard" or the possibility of enunciating it (*Jacobellis* v. *Ohio, supra,* 378 U.S. 184, 200 [12 L.Ed.2d 793, 805], Warren, C. J., dissenting, joined by Clark, J.) and that Justice Black has written that he is not sure whether the Supreme Court opinions clarify with certainty "whether the 'community standards' referred to are world-wide, nation-wide, section-wide, country-wide, precinct or township-wide" (*Ginzburg* v. *United States* (1966) 383 U.S. 463, 479-480 [16 L.Ed.2d 31, 43, 86 S.Ct. 942], Black, J., dissenting). However, the defendant was given the benefit of the "national standard" in this case. The jury was drawn from the Los Angeles area, reported to be the central source nationally of obscene materials (*Flack* v. *Municipal Court, supra,* 66 Cal.2d 981, 993, fn. 14). The jurors here are exposed to all kinds of publications, broadcasts and television shows. The theatres in the area are of various types exhibiting all kinds of films and plays. The night clubs in this area and in Las Vegas put on sophisticated shows. A jury drawn from the Los Angeles area probably represents as sophisticated a jury by national standards as could be drawn any place in this country.

contents of the material, and must have been in some manner aware of its obscene character,'' and (2) the evidence was insufficient to meet even the standard of knowledge which the trial court thus applied.

The foregoing construction of Penal Code, section 311, subdivision (e) was approved by this court in *People* v. *Moskovitz* (1967) *supra*, CR A 7293, trans. denied by Court of Appeal. It meets the federal constitutional requirement of scienter. (*Mishkin* v. *New York* (1966) 383 U.S. 502, 511 [16 L.Ed.2d 56, 63, 86 S.Ct. 958].) To construe the code language to mean that an accused must know that the matter will actually be held constitutionally obscene by the highest court of the land is not a workable standard. Such a construction of Penal Code, section 311, subdivision (e) would altogether stultify obscenity prosecutions. (*Redrup* v. *New York* (1967) 386 U.S. 767, 771-772 [18 L.Ed.2d 515, 518-519, 87 S.Ct. 1414, 1416-1417], Harlan, J., dissenting, joined by Clark, J.; *Ginzburg* v. *United States, supra*, 383 U.S. 463, 480-481 [16 L.Ed.2d 31, 44], Black, J., dissenting;[8] *Jacobellis* v. *Ohio, supra*, 378 U.S. 184 [12 L.Ed.2d 793, 84 S.Ct. 1676].)

We bear in mind the factors to be weighed in setting up a scienter standard as pointed out by Justice Frankfurter, concurring in *Smith* v. *California* (1959) 361 U.S. 147, at p. 164 [4 L.Ed.2d 205, at p. 217, 80 S.Ct. 215] :

'' [T]he proof of scienter that is required to make prosecutions for obscenity constitutional cannot be of a nature to nullify for all practical purposes the power of the State to deal with obscenity. Out of regard for the State's interest, the Court suggests an unguiding, vague standard for establishing 'awareness' by the bookseller of the contents of a challenged book in contradiction of disclaimer of knowledge of its contents. A bookseller may, of course, be well aware of the nature of a book and its appeal without having opened its cover or, in any true sense, having knowledge of the book. As a practical matter therefore the exercise of the constitutional right of a State to regulate obscenity will carry with it some hazard to

---

[8]''My conclusion is that certainly after the fourteen separate opinions handed down in these three [*Ginzburg, Mishkin,* and *Fanny Hill*] cases today no person, not even the most learned judge much less a layman, is capable of knowing in advance of an ultimate decision in his particular case by this Court whether certain material comes within the area of 'obscenity' as that term is confused by the Court today.''

See also *Curtis Publishing Co.* v. *Butts* (1967) 388 U.S. 130, 171 [18 L.Ed.2d 1094, 1120-1121, 87 S.Ct. 1975, 2000], Black, J., concurring in the *Walker* case and dissenting in the *Butts* case.

the dissemination by a bookseller of non-obscene literature. Such difficulties or hazards are inherent in many domains of the law for the simple reason that law cannot avail itself of factors ascertained quantitatively or even wholly impersonally.''[9]

We cannot impute to the Legislature an intent to employ the words ''knowledge that the material is obscene'' in a sense that would render prosecutions under Penal Code, section 311.2 an impossibility. Awareness of the contents of a matter and that it is of obscene character or nature was all that was intended and all that is constitutionally required. (*Mishkin* v. *New York, supra,* 383 U.S. 502, 511 [16 L.Ed.2d 56, 63].) The instruction to the jury embodying the trial court's construction of Penal Code, section 311, subdivision (e) was not error.[10] The rule of reason may properly be applied in the construction of criminal statutes. (*Nash* v. *United States* (1913) 229 U.S. 373, 377 [57 L.Ed. 1232, 1235, 33 S.Ct. 780], Holmes, J., speaking for the court.)

 The evidence is sufficient to support the jury's implied finding that defendant Pinkus was aware of the contents of the films which he distributed, offered for distribution, or possessed with the intent to distribute on both July 14, 1966, and October 19, 1966, and of their obscene character.

Although defendant Pinkus denied ownership of the Rosslyn News Co., 450 South Main Street, Los Angeles, the People introduced ample documentary evidence proving to the contrary.

Exhibit 9-a was a Certificate of Doing Business under a Fictitious Name filed with the county clerk's office,[11] showing William Pinkus as conducting business under the name

---

[9]See also: Comment 14 to proposed section 207.10, ALI, Model Penal Code, Tentative Draft No. 6, pp. 49-51 (1957), and ALI, Model Penal Code, Proposed Final Draft section 251.4 and comments thereto, pp. 237-240 (1961). Of interest is the rebuttable presumption proposed in section 251.4, subdivision (2), last paragraph, ''A person who disseminates or possesses obscene material in the course of his business is presumed to do so knowingly or recklessly.''

[10]This accords with the construction placed upon this section in *People* v. *Campise* (1966) 242 Cal.App.2d Supp. 905, 915 [51 Cal.Rptr. 815]. The State Supreme Court in overruling this case did not state whether the entire case and all its holdings are overruled or whether it was confined to just its rulings on search and seizure of films without a search warrant. (*Flack* v. *Municipal Court, supra,* 66 Cal.2d 981, 986, fn. 2.)

[11]Required by Civil Code, sections 2466 et seq. Section 2469 requires a new publication and filing upon a change in personnel. No such change appears to have been published or recorded by defendant Pinkus or Joe Sadowsky.

"Rosslyn News Co." at 450 South Main Street, Los Angeles. Exhibit 10-a, b, c consists of City of Los Angeles tax statements executed by defendant showing that he (William Pinkus doing business as Rosslyn News Co.) started business on March 13, 1965, at 450 South Main Street and that he discontinued the same as of February 14, 1967. Exhibit 11 (b) was a bank signature card of the Farmers and Merchants Office of the Security First National Bank,[12] account No. Com'l. 101-311, for Rosslyn News Co., 450 South Main Street, dated March 23, 1965, with the only authorized signature for drawing on the account being that of defendant William Pinkus. This account was still active at the time of trial, although the address had been changed on the bank records to 7769 Santa Monica Boulevard, Los Angeles, sometime after September 30, 1966. The latter address is the address which defendant admitted to be the locale of his mail order business. Ledger sheets for the months of June, July, August and September of 1966 were introduced, showing numerous drawings and deposits (account address: 450 South Main Street), and for the month of February 1967 (account address: 7769 Santa Monica Boulevard). Exhibit 11 (a) was a customer's statement for the month of April 1966, likewise reflecting numerous deposits into and drawings on account No. 101-311.

Defendant admitted that he had signed the Certificate of Doing Business under a Fictitious Name, the City of Los Angeles tax business statements, and the bank signature card. He also testified that no one else was authorized to draw checks upon this account No. 101-311.

Some 25 cancelled checks bearing printed notation, "Rosslyn News Co., 450 South Main Street, Los Angeles, California 90013," with respective dates in the month of April 1966 were shown to the defendant. He admitted the signatures thereon to be his. He admitted that at least 14 of these 25 were for the business conducted at 450 South Main Street. He also admitted signing checks drawn on the account for $87.54 to the Board of Equalization bearing the notation "Sales Tax," and checks made payable to the order of the Internal Revenue Service for $113, to Pacific Telephone for $62.40, to the Department of Employment for $74.14, and to a Pitney-Bowes—all drawn on the Rosslyn News Co. account No. 101-311. He signed most of these checks at 450 South Main Street.

A John Adams, a defense witness, testified that he had

---

[12]Located at 401 South Main Street, Los Angeles.

worked at 450 South Main Street and that the two payroll checks made out to him were signed "William Pinkus."

Police Officer Roberts testified that he had seen defendant Pinkus at the 450 South Main Street store 10 to 12 times between June and September 1966. On July 6, 1966, eight days before he purchased Exhibit 2, marked "J," this witness saw defendant Pinkus standing behind the counter waiting on customers and working with the stock in trade at 450 South Main Street.

Defendant denied ownership of the Rosslyn News Co. at 450 South Main Street, claiming that he was an owner in name only and that the real owner was a Joe Sadowsky who owned the "Main Street News" at 516 South Main Street, and that he (Pinkus) had a mail order business at 7769 Santa Monica Boulevard, Los Angeles, and was licensed to operate an Arcade at 7742 Santa Monica Boulevard, Los Angeles. He testified that he handled books, films, and photo sets in his mail order business. The books (paperbacks) were similar to those introduced on the other counts at trial, that the films were "nudist films" showing women wrestling each other. The photo sets were of the bondage wrestling type; the art-sets depicted girls in various stages of undress. He admitted that he had sold some of the photographs showing girls wrestling in various stages of undress to 450 South Main Street. He also admitted manufacturing some books of the kind depicted in the photographs introduced into evidence, producing about six titles every six to eight weeks.

Photographs of the interior of the store at 450 South Main Street (Exhibit 1) were shown to the defendant. Some depict signs reading, "8-MM film for Sale," "No Minors Allowed," and "FILM VIEWER $12.75." Others depict shelves and racks filled with nudist wrestling, bondage, mascochistic or lesbian type of paperbacks, photographs, and "art-sets." Some of these were the matters involved in the other counts. No evidence appears to have been presented to show that this so-called news company (Rosslyn News Co.) actually was stocked up with books, magazines, or films other than the types introduced into evidence.

Defendant admitted that all the money from the Rosslyn News Co. and his mail order business were put into one and the same bank account. He denied distributing or causing to be distributed or put up for sale the films involved in the two cases.

The jury impliedly found defendant's denial of ownership

of the Rosslyn News Co. at 450 South Main Street to be untrue, and from that they could have further found that his other denials were likewise untrue. The jury could have found in the context of the evidence produced in this case that defendant's statements were falsehoods indicating a consciousness of guilt. (*People* v. *Wayne* (1953) 41 Cal.2d 814, 822-823 [264 P.2d 547]; *People* v. *Santo* (1954) 43 Cal.2d 319, 327 [273 P.2d 249]; *People* v. *Osslo* (1958) 50 Cal.2d 75, 93 [323 P.2d 397]; *People* v. *Bertholf* (1963) 221 Cal.App.2d 599, 602 [34 Cal.Rptr. 558].)

As defense witness Adams testified, whenever the shop at 450 South Main was closed the inventory was taken back to 516 South Main Street. Why?

Whether defendant actually dealt with matters or materials which would make him aware of the contents and character of the films alleged to be obscene in the two cases are questions of historical facts. (*Zeitlin* v. *Arnebergh* (1963) 59 Cal.2d 901, 910, fn. 13 [31 Cal.Rptr. 800, 383 P.2d 152, 10 A.L.R.3d 707].) The evidence was sufficient to support the jury's findings against the defendant upon these factual issues. (*People* v. *Hillery* (1965) 62 Cal.2d 692, 702-703 [44 Cal.Rptr. 30, 401 P.2d 382].)

## CONCLUSION

We find no merit to any of the grounds which defendant Pinkus assigns for reversing the judgments of conviction. The judgment of conviction should be affirmed in both cases CR A 7573 and CR A 7574.

It is so ordered.

Meyer, J., and Whyte, J., concurred.